Filed 11/18/15

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

|  |  |
|---|---|
| SAN FRANCISCO BAYKEEPER, INC., <br><br>     Petitioner and Appellant, <br><br> v. <br><br> CALIFORNIA STATE LANDS COMMISSION, <br><br>     Defendant and Respondent; <br><br> HANSON MARINE OPERATIONS, INC. et al., <br><br>     Real Parties in Interest. | A142449 <br><br> (San Francisco City & County Super. Ct. No. CPF-12-512620) |

**I.**

**INTRODUCTION**

In October 2014, the California State Lands Commission (SLC) approved the San Francisco Bay and Delta Sand Mining Project (the project), which authorizes real parties in interest Hanson Marine Operations, Inc., Morris Tug & Barge, Inc. and Suisun Associates (collectively, Hanson) to continue dredge mining sand from sovereign lands under the San Francisco Bay pursuant to 10-year mineral extraction leases. San Francisco Baykeeper, Inc. (Baykeeper) filed a petition for writ of mandate challenging the SLC's decision to approve the project, which the trial court denied. In this court, Baykeeper contends (1) the SLC failed to comply with the California Environmental Quality Act (CEQA) (Pub. Resources Code,[1] § 21000 et seq.), and (2) the mineral leases authorized by the SLC's approval of the project violate the common law public trust

---

[1] Statutory references are to the Public Resources Code unless otherwise stated.

1

doctrine. As we explain, the SLC's environmental review of the mining project complied with CEQA, but its failure to consider whether the sand mining leases are a proper use of public trust property requires us to reverse the judgment, and to direct the trial court to grant the writ of mandamus requiring the SLC to address this important issue.

## II.

## STATEMENT OF FACTS

### A. The Project

In 1998, the SLC granted Hanson's predecessors-in-interest 10-year mineral extraction leases authorizing the dredge mining of sand from delineated areas under the Central San Francisco Bay, Suisun Bay and the western Sacramento-San Joaquin River Delta. In 2006, Hanson applied for an extension of the leases for an additional 10 years. The lease parcels are all sovereign lands, owned by the State of California subject to the public trust, and managed by the SLC. Because the leases expired before the SLC decided whether to extend them, it authorized Hanson to continue mining on a month-to-month basis while it reviewed an application for five new 10-year mineral extraction leases of essentially the same parcels of sovereign lands. Four of these leases, along with another lease of a privately owned parcel in the Suisun Bay, comprise the project that has become the subject of this litigation.

The purpose of Hanson's dredge mining operation is to obtain marine aggregate sand for construction purposes within the greater San Francisco area. Bay sand is composed of "alluvial sand and gravel resulting from erosion and sediment transport" which, in contrast to other types of crushed stone aggregate, has rounded edges making it desirable for construction because it is easier to use and causes less wear on equipment. The mining method Hanson employs involves the use of a trailing arm hydraulic suction dredge and barge. A tugboat positions the barge over the mining site, and the hydraulic suction dredge creates a flurry of water and sand, which mobilizes the sand and then pumps it into the barge. A typical mining event lasts approximately three to four hours.

The project "objective" proposed by Hanson was "[t]o obtain renewal of all necessary permits and approvals necessary to continue mining sand at an economically

2

viable level in San Francisco Bay for the next 10 years." Hanson sought authorization to mine a maximum volume of sand in the amount of 2.04 million cubic yards per year (cy/yr). This figure was lower than the total permitted annual mining volume during the previous lease period which was capped at 2.240 million cy/yr. However, the average annual volume of sand that was actually mined from the lease areas between 2002 and 2007 was only 1,426,650 cy/yr.

### B. Environmental Review

The SLC determined this project may have a significant adverse impact on the environment necessitating preparation of an environmental impact report (EIR). In July 2007, it published a "Notice of Preparation" (NOP) of the EIR. In a July 2010 Draft EIR (the 2010 Draft EIR), SLC staff examined "the potential environmental effects of the proposed new leases and continuing sand mining for an additional 10-year period." The public was invited to submit comments on the 2010 Draft EIR in writing and in person at two public meetings that were held in August 2010. Thereafter, SLC staff determined that changes to the project constituted significant new information which required recirculating a full revised draft EIR in November 2011 (the 2011 Revised Draft EIR).

The change most relevant to this appeal pertained to the EIR's definition of the "baseline" condition against which to measure the environmental impacts of the project. The 2010 Draft EIR had defined that baseline as the volume of sand mined from the lease parcels in 2007, the year the NOP for this EIR was published. However, in the 2011 Revised Draft EIR, SLC staff concluded that "a baseline that accounts for mining levels over several years provides a more accurate measure of the current level of mining activity against which to evaluate Project impacts." Therefore, the baseline used in the 2011 Revised Draft EIR was the average annual volume of sand mined in the proposed project area per year from 2002 to 2007.

In September 2012, the SLC published a Final EIR for the project. In that document, SLC staff provided responses to 12 sets of comments on the 2011 Revised Draft EIR and additional "Master Responses" which addressed three topics that were the subject of multiple comments: (1) the definition of the baseline used to evaluate the

3

impacts of the project; (2) the potential adverse impact of the project on the erosion of the San Francisco Offshore Bar and shoreline;[2] and (3) the standards of significance used to evaluate the impact of the project on mineral resources. Additional information responsive to some of these comments was also incorporated into the Final EIR's analyses of pertinent issues. SLC staff concluded these revisions did not require recirculation of the EIR.

The Final EIR's analyses of the environmental impacts of the project examined "the differences between the proposed sand mining operations and the sand mining that occurred, on average, under the original lease agreements in the five years before the NOP was issued." SLC staff concluded the project "would have the potential for several significant impacts, including impacts on Biological Resources, Hazards and Hazardous Materials, Air Quality, Cultural Resources, and Land Use and Recreation." All but one of these impacts could be reduced through mitigation to a less than significant level. The one impact which was considered both a significant project impact and a significant cumulative impact even after all appropriate mitigation measures were applied was that the "[r]egular operation of sand mining activities will cause entrainment and mortality of delta and longfin spelt."

The Final EIR also evaluated four project alternatives: (1) a "No Project Alternative" under which the SLC would not issue the proposed mining leases and other regulatory agencies would not renew permits necessary for Hanson to continue mining on public lands or on the privately held parcel within the project area; (2) a "Long-term Management Strategy Conformance Alternative," which would require Hanson to comply with temporal and special restrictions on dredging contained in the "Long-Term Management Strategy for the Placement of Dredged Material in the San Francisco Bay Region Management Plan 2001," but would otherwise approve the project as proposed by Hanson, including the proposed mining volumes; (3) a "Clamshell Dredge Mining

---

[2] The San Francisco Offshore Bar (Bar) "is an area directly west of the Golden Gate Bridge where sand and sediments flow through at high velocities from the narrow gate into a wide and shallow horse-shoe shaped plateau where sediments are deposited."

4

Alternative," which would require Hanson to employ an alternative to its suction dredge mining method; and (4) a "Reduced Project Alternative" which would "reduce permitted annual mining volumes in all of the lease areas to a level equivalent to the baseline mining volumes (i.e., the 2002 to 2007 average mined at each Project parcel)."

According to the Final EIR, the No Project Alternative would avoid most of the significant impacts of the project, but would also "require the Bay Area construction industry to acquire sand from other, likely more distant sources, with consequent increases in air emissions, including greenhouse gases." Therefore, this No Project Alternative was "not considered environmentally superior to the other alternatives or to the Project as proposed." Instead, the Final EIR identified the Reduced Project Alternative as the environmentally superior alternative because it would "reduce the intensity of the Project's significant impacts, and would likely render mitigation measures easier to implement and achieve." Furthermore, although this alternative could result "in significant unavoidable air quality impacts associated with importing sand and obtaining sand from quarries, the overall intensity of impacts would be less than the other alternatives."

### C. The SLC's Decision

On October 19, 2012, the SLC certified the Final EIR and approved a modified version of the project, which was referred to as the "Reduced Project Alternative with Increased Volume Option." The SLC adopted the Reduced Project Alternative proposed in the Final EIR, but added an "Option" which provided that the total volume of sand Hanson would be allowed to mine could be increased to the proposed project levels if Hanson complied with conditions demonstrating a reduction of the two most significant adverse impacts of the project: (1) the entrainment and mortality of delta and longfin smelt, and (2) the emission of criteria pollutants.

The SLC formalized its decision in a "Statement of Findings and Statement of Overriding Considerations." The SLC made findings addressing each of the significant environmental impacts identified in the final EIR. The SLC's decision included a "Statement of Overriding Considerations" because the final EIR identified significant

5

impacts of the approved project that "cannot feasibly be mitigated to below a level of significance."[3]  In that Statement, the SLC balanced the unavoidable environmental impacts against the benefits of the project, which included providing jobs, supplying high quality sand to the Bay Area construction industry, and generating substantial royalties for the state.  The SLC found, among other things, that if the project was not approved, regional demand for construction aggregate would require obtaining sand from other sources including quarries in the region and imports from Canada, which was feasible but would result in "greater environmental consequences, particularly air quality impacts." Ultimately, the SLC concluded that "the benefits anticipated by implementing the Project outweigh and override the expected significant effects."

Like the Final EIR, the SLC's Statement of Findings and Statement of Overriding Considerations recognized that the project involves 10-year mineral extraction leases of California sovereign lands.  However, the SLC did not address its obligations under the common law public trust doctrine or make any findings regarding the propriety of authorizing private parties to mine sand from sovereign lands.

### D.  The Mandate Proceeding

In November 2012, Baykeeper filed a petition for writ of mandate to compel the SLC to set aside its approval of the project for failing to comply with CEQA.  Pursuant to a March 2013 amendment, Baykeeper added a cause of action for violating the public trust doctrine.  Initially, the superior court sustained a demurrer to Baykeeper's public trust claim, concluding that this doctrine does not create a separate cause of action for enforcing CEQA.  Subsequently, however, this court granted Baykeeper's petition for a writ of mandate and directed the superior court to vacate its prior order and overrule the demurrer to the public trust cause of action.  As we explained in our order, the issue

---

[3]  "A statement of overriding considerations is required ' "[i]f approval of the project will result in significant environmental effects which 'are not at least substantially mitigated . . . .' " ' [Citations.]  Such statement provides the agency's reasons for proceeding with the project despite its unavoidable environmental risks.  [Citation.]" (*Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 569 (*Citizens for East Shore Parks*).)

whether sand mining is a public trust use is distinct from CEQA. On April 28, 2014, the trial court denied Baykeeper's mandate petition, finding that the final EIR satisfied all the pertinent requirements of CEQA, and that the mineral leases did not violate the public trust doctrine.

## III.

## CEQA DISCUSSION

### A. Issues on Appeal

Baykeeper contends that the SLC violated CEQA by approving the project pursuant to a deficient EIR. " ' "The EIR is the heart of CEQA" and the integrity of the process is dependent on the adequacy of the EIR. [Citations.]' [Citation.] 'The purpose of an [EIR] is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' (§ 21061.)" (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1045 (*Treasure Island*).)

"An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . . The courts have looked not for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Guidelines, § 15151.)[4]

_____

[4] All references to "Guidelines" are to the CEQA Guidelines promulgated by the state's Resources Agency pursuant to section 21083. (Cal. Code Regs., tit. 14, § 15000 et seq.) " 'In interpreting CEQA, we accord the Guidelines great weight except where they are clearly unauthorized or erroneous.' [Citation.]" (*Communities for a Better Environment v. South Coast Air Quality Management Dist.* (2010) 48 Cal.4th 310, 319, fn. 4 (*South Coast Air*).)

"We review an agency's determinations and decisions for abuse of discretion. An agency abuses its discretion when it fails to proceed in a manner required by law, or when its determination or decision is not supported by substantial evidence. [Citations.] Judicial review of these two types of error differs significantly: While we determine de novo whether the agency has employed the correct procedures, scrupulously enforcing all legislatively mandated CEQA requirements, we accord greater deference to the agency's substantive factual conclusions. [Citation.] In CEQA cases, as in other mandamus cases, we independently review the administrative record under the same standard of review that governs the trial court. [Citation.]" (*Treasure Island*, *supra*, 227 Cal.App.4th at p. 1045.)

With these standards in mind, we turn to Baykeeper's specific complaints about the Final EIR, which are: (1) the baseline for assessing projects is not supported by the record; (2) SLC staff failed to analyze properly project impacts on soil erosion and to elicit public comment on significant new information about this issue which was included in the Final EIR; (3) SLC staff criteria to evaluate project impacts on mineral resources; and (4) the SLC failed to notify and consult with interested agencies about the project.

### B. The Baseline

Baykeeper contends that the SLC abused its discretion by using a baseline which did not accurately reflect existing conditions at the mining sites.

#### 1. Background

As noted in our factual summary, when the SLC started its environmental review it used the volume of sand mined from the leased parcels during 2007, the year the NOP was filed, as its baseline for measuring project impacts. However, it subsequently determined that a five-year average of annual mining volumes was a better indicator of existing mining conditions than the 2007 rate. The 2011 Revised Draft EIR, which was circulated for agency and public comment, explained how and why the baseline was changed. SLC staff found that the volume of sand mined from the leased areas during 2007 was not an accurate reflection of existing baseline conditions because (1) limiting the baseline to any single calendar year would fail to account for the fact that the "annual

8

quantity of sand mined fluctuates substantially due to changes in demand, economic conditions, capacity, and other factors," and (2) the volume of sand that was mined in 2007 was in the "low range when compared with previous years."

The Final EIR further explained the baseline change in responses to comments on the 2011 Revised Draft EIR and in a Master Response about the baseline. SLC staff acknowledged that the time of NOP publication normally constitutes the baseline condition for the project, but also found that "[i]n some instances, as here, where the level of an existing operation can vary substantially from year to year, a lead agency may opt to consider an average level of operations over some period of years to characterize that existing operation." SLC staff also opined that using the average volume of sand mined per year from 2002 to 2007 "recognizes that sand mining activity levels can fluctuate substantially from year to year depending on market demand and other factors: the average of several years best characterizes the overall level of mining activity at the time the NOP was published." Furthermore, staff explained that its baseline was conservative because the intensity of sand mining operations during the 2002-2007 period was lower than the average for the entire 10-year period covered by Hanson's prior set of leases and was also lower than permitted levels for that prior period.

### 2. Analysis

Baykeeper contends the Final EIR's entire impacts analysis was deficient because the baseline conditions were artificially inflated and not reflective of current mining conditions in the project area.

To consider properly any significant adverse effects a project is likely to have on the physical environment, "an EIR must delineate environmental conditions prevailing absent the project, defining a baseline against which predicted effects can be described and quantified. [Citation.]" (*Neighbors for Smart Rail v. Exposition Metro Line Construction Authority* (2013) 57 Cal.4th 439, 447 (*Neighbors for Smart Rail*).) This baseline "must ordinarily be the actually existing physical conditions rather than hypothetical conditions that could have existed under applicable permits or regulations. [Citation.]" (*Id.* at p. 448, italics omitted; see also *South Coast Air*, *supra*, 48 Cal.4th at

9

pp. 320–323.)  This general rule derives from Guidelines section 15125, subdivision (a), which states:  "An EIR must include a description of the physical environmental conditions in the vicinity of the project, as they exist at the time the notice of preparation is published, or if no notice of preparation is published, at the time environmental analysis is commenced, from both a local and regional perspective.  This environmental setting will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant."

However, " 'the date for establishing a baseline cannot be a rigid one. Environmental conditions may vary from year to year and in some cases it is necessary to consider conditions over a range of time periods.'  [Citation.]"  (*South Coast Air*, *supra*, 48 Cal.4th at pp. 327-328.)  Thus, "despite the CEQA Guidelines' reference to 'the time the notice of preparation is published, or if no notice of preparation is published, . . . the time environmental analysis is commenced' [citation], '[n]either CEQA nor the CEQA Guidelines mandates a uniform, inflexible rule for determination of the existing conditions baseline.  Rather, an agency enjoys the discretion to decide, in the first instance, exactly how the existing physical conditions without the project can most realistically be measured, subject to review, as with all CEQA factual determinations, for support by substantial evidence.'  [Citation.]"  (*Neighbors for Smart Rail*, *supra*, 57 Cal.4th at p. 449.)

In this case, the SLC determined that a five-year average of annual mining volumes was a better indicator of existing mining conditions than the 2007 rate in light of the financial crisis of 2007, and the general nature of the mining industry.  Those findings are supported by substantial evidence including data from the California Geological Survey that "California's residential construction slowdown during [2007] contributed to a significant decrease in both production and value of construction aggregate (sand and gravel and crushed stone)."  Statistics regarding the permitted and actual sand mining volumes from the lease areas during the previous lease period also support the SLC's conclusions about the fluid nature of mining activities in general.  Thus, the SLC did not

abuse its discretion by adopting a baseline that accounted for mining conditions during the five-year period prior to the filing of the NOP.

Arguing for a contrary conclusion, Baykeeper contends that the SLC's baseline is not supported by "meaningful analysis."  (Citing *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 128 [EIR contained inadequate baseline discussion because it invited agency to select among multiple water production figures with no meaningful analysis or showing that figures were accurate]; *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 955 ["An adequate EIR requires more than raw data; it requires also an analysis that will provide decision makers with sufficient information to make intelligent decisions."].) However, we find that the parts of the Final EIR summarized above contain a meaningful analysis of the information that the SLC considered when defining the baseline for this project.

Baykeeper insists the baseline analysis was inadequate because the Final EIR "did not disclose, let alone analyze, more recent sand mining levels, which dropped substantially after 2007, during the precise period between the publication of the Draft EIR and the Revised Draft EIR."  In fact, the SLC did address this issue in the comments section of the Final EIR where it explained that "inclusion of the unusually low mining volumes in years after NOP publication during the economic downturn commonly considered the most pronounced recession since the Great Depression would distort the baseline by understating the overall levels of mining in years prior to the expiration of the previous leases and commencement of EIR preparation."  Baykeeper's disagreement with the Final EIR's analysis is insufficient to establish that the SLC abused its discretion.

### C.  Erosion and Sedimentation

Baykeeper contends that the Final EIR's discussion of the environmental impacts of the project on the erosion of coastal beaches is (1) inadequate because EIR preparers did not actually analyze the cumulative impacts of commercial sand mining on erosion of the coast and Bar, and (2) improper because it included significant new information that was not circulated for public or agency comment.

11

### 1. Background

The potential direct and cumulative impacts of the project on soil erosion were considered in a section of the Final EIR, which analyzed impacts on hydrology, geomorphology, and water quality. This analysis included a comprehensive discussion of the relevant environmental setting, including the regional setting and climate, surface water hydrology and drainage, estuarine circulation, sediment dynamics, bathymetry, and morphology. Significantly, SLC staff "estimated that the net change in volume within the Central Bay sand mining lease areas was a loss of approximately 11.6 million cubic yards of sediment from 1997 to 2008," and recognized that this volumetric loss "is roughly equivalent to the reported volumes of sand mined from the Central Bay lease areas over this same time period."

The Final EIR used a 2009 study by Coast Harbor Engineering (the CHE study) to evaluate the project impacts on erosion or sedimentation. The CHE study included a sand mining resource evaluation as well as an impact assessment of this specific project. CHE performed a bathymetry analysis of data collected from the lease areas and surrounding locations over the past 10 years. It also used numerical models to compare existing conditions to two project-condition scenarios. These analyses showed, among other things, that (1) reported mining volumes in the lease areas are approximately equal to the measured erosion from 1997 to 2008, an indication that mining resources available for the proposed additional 10 years of mining are limited to sand already in place; (2) erosion attributable to mining is confined to the vicinity of the mined areas; (3) sand mining is not likely to cause measurable sediment depletion outside the mining areas; (4) the effects of mining on sediment transport are limited to the vicinity of the mining activity; and (5) very little sediment is transported from the mining areas to the outer coast location of the San Francisco Bar. Adopting these findings, the Final EIR concluded that "an additional 10 years of mining, combined with the last 10 years of mining and future maintenance dredging, is expected to further alter the morphology of the seabed in these locations, with concomitant, though minor and less-than significant effects on circulation, sediment transport, and water quality."

12

In addition to finding a less than significant project impact, the final EIR separately considered the potential "cumulative effects on sediment transport and coastal morphology." SLC staff recognized that some studies "suggest[]" that sand mining in the Bay contributes to the observed erosion of the coastal beaches, the theory being that sand-sized sediment from the San Francisco Bar is transported through wave energy and distributed along coastal beaches and, therefore, any erosion of the Bar caused by sand mining also substantially contributes to the erosion of coastal beaches. Despite these suggestions, the Final EIR found that "a direct or empirical causal link between commercial sand extraction from the Bay and erosion of the San Francisco Bar has not been established," noting that other plausible explanations for the erosion of the Bar include increase in wave height and changes in the tidal prism of the Bay. Furthermore, the Final EIR found that, although sand mining has caused a reduction in the average annual net sediment within the Bay-Delta estuary, "it is not clear if and how the losses due to mining translate to observed changes in other areas within or just outside of the estuary, including the San Francisco Bar."

As noted in our factual summary, a Master Response in the Final EIR addressed several comments the SLC received about the impacts of the project on sediment transport and coastal morphology. To better respond to those comments, SLC staff arranged for the "EIR preparers to undertake supplemental analysis, including new modeling, to further investigate and quantify the potential for the Project to reduce the volume of sediment transported through the Golden Gate to the Bar and Ocean Beach."

The new information SLC staff reviewed included two recent but not yet published scientific articles authored by United States Geological Survey Coastal Geologist Patrick Barnard and others (the 2012 Barnard articles), which drew connections between sediment transport in the Bay, the shrinking Bar, and the erosion of coastal beaches. The SLC was particularly concerned by a conclusion in one article that corroborated an earlier finding by Barnard that sand waves patterns indicate that sediment is transported from the central Bay in the direction of the Bar. The 2012 Barnard articles did not quantify the rate at which sediment was being transported to the Bar or explore

13

the effects of sand mining on that process. Nevertheless, out of an abundance of caution, SLC staff arranged for a supplemental modeling study which was "intended to quantify the potential contribution of the Project, and in particular continued sand mining in the Central Bay lease areas, to the observed shrinking of the Bar, and therefore erosion within certain areas of Ocean Beach."

CHE performed the supplemental modeling and sediment transport analysis and its conclusions were incorporated into the Final EIR's discussion of project impacts on sediment transport and coastal morphology. According to the Final EIR, CHE's supplemental findings reinforced the conclusions in the 2011 Revised Draft EIR regarding the less than significant project specific and cumulative impacts on coastal and Bar erosion. In this regard, the Final EIR stated:

"[S]upplemental analysis of the previous modeling effort and the results of new modeling presented in this EIR confirm the findings and conclusions previously reached for [the project impact] and for cumulative effects of the Project on sediment transport, as reiterated below. The original CHE study presented in Appendix G of the EIR, and supplemental analyses confirm the EIR conclusions regarding [the project] impact . . . and the potential cumulative effects of the Project on sediment transport and coastal morphology. The results of these analyses clarify and quantify the conclusion reached in Appendix G of the EIR: if the Project is approved and sand mining continues at the proposed volume for a 10-year period, there is likely to be a reduction of 5,000-7,000 cubic yards of sediment transported from Central Bay through the Golden Gate annually. This range represents approximately 0.2-0.3 percent of the long-term rate of erosion of the Bar, as calculated by Hanes and Barnard (2007). Consistent with the conclusions presented in this EIR, the [SLC] considers this Project-associated reduction in sediment transport, and any secondary effects on coastal morphology, to be a less-than-significant impact, and a less-than-cumulatively considerable contribution to a cumulative impact."

## 2. Adequacy of Cumulative Impacts Analysis

Baykeeper contends the cumulative impact analysis was incomplete because it did not include an actual assessment of the impact of this project in combination with other relevant past, present and future sand projects.

" 'The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonabl[y] foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time.' (CEQA Guidelines, § 15355, subd. (b).) 'Cumulative impact analysis "assesses cumulative damage as a whole greater than the sum of its parts." ' [Citation.]" (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1403.)

The Guidelines require that an EIR discuss "cumulative impacts of a project when the project's incremental effect is cumulatively considerable." (Guidelines, § 15130, subd. (a).) If, on the other hand, the cumulative impact is insignificant or if the project's incremental contribution to the impact is not cumulatively considerable, the Lead Agency is not required to conduct a full cumulative impacts analysis, but the EIR must include a brief explanation of the basis for the agency's finding(s). (*Ibid*.; *City of Long Beach v. Los Angeles Unified School Dist.* (2009) 176 Cal.App.4th 889, 909 (*City of Long Beach*).

As discussed above, the Final EIR provided more than a brief explanation for its conclusions regarding the project's incremental contribution to the cumulative impact on sediment transport and coastal erosion. Because SLC staff found that impact was less than significant, a more comprehensive analysis of the cumulative impact of past, present, and future sand mining projects on sediment transport and coastal erosion was not required. (Guidelines, § 15130, subd. (a); *City of Long Beach*, *supra*, 176 Cal.App.4th at p. 909.)

Baykeeper contends that the Final EIR's conclusion regarding the incremental effect of the project was erroneous because it was based on an improper "ratio" theory, pursuant to which SLC staff found the project's incremental impact was relatively

15

insignificant by comparing it to the overall problem of coastal erosion.  To support this argument, Baykeeper relies on *Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692 (*Kings County*).  The *Kings County* court found that an EIR prepared for a project to develop a 26.4-megawatt coal-fired cogeneration plant in the City of Hanford contained "insufficient information in several respects for the Hanford City Council to have made an informed decision whether to approve the project." (*Id*. at p. 707.)

Among its many problems, the *Kings County* EIR contained insufficient information about the cumulative impacts of the project on air quality within the valley-wide area.  (*Kings County*, *supra*, 221 Cal.App.3d at pp. 718-721.)  Acknowledging that cumulative ozone impacts of valley-wide energy development projects were potentially significant, the EIR preparers nevertheless found that the project would not have a significant cumulative impact because it would contribute less than one percent of area emissions for all criteria pollutants in the valley.  (*Ibid*.)  The *Kings County* court found that this " 'ratio' theory" "improperly focused upon the individual project's relative effects and omitted facts relevant to an analysis of the collective effect this and other sources will have upon air quality." (*Id*. at p. 721.)  As the court explained, this approach "avoids analyzing the severity of the problem and allows the approval of projects which, when taken in isolation, appear insignificant, but when viewed together, appear startling." (*Ibid*.)  Beyond that, the court found that this ratio theory creates the false impression that the greater the overall environmental problem, the less significant an individual project's contribution to the problem will be.  (*Ibid*.)

*Kings County* and its progeny illustrate that a project's cumulative environmental impact cannot be deemed insignificant solely because its individual contribution to an existing environmental problem is relatively small.  (*Kings County*, *supra*, 221 Cal.App.3d 692, 718-721; *Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1024-1026; *Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 118-121 (*California Resources Agency*), overruled on another ground in *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1109, fn. 3.)  In fact, "the greater the existing environmental problems

16

are, the lower the threshold should be for treating a project's contribution to cumulative impacts as significant." (*California Resources Agency*, *supra*, 103 Cal.App.4th at p. 120, fn. omitted.) By the same token, however, these cases do not hold that any additional effect a project may have "necessarily creates a significant cumulative impact; the 'one [additional] molecule rule' is not the law." (*Ibid*., fn. omitted, original italics.) Rather, to conduct a proper assessment of cumulative impact an EIR must consider not just whether that cumulative impact is significant but also whether the proposed project's incremental effects are cumulatively considerable. (*Ibid*.)

Here, as discussed above, the Final EIR's analysis of cumulative impacts of Bay mining on the erosion of the San Francisco Bar and coastal beaches discussed efforts by CHE to quantify the potential contribution of the project to the erosion of the San Francisco Bar. If, as Baykeeper contends, that exercise produced an irrelevant ratio, it was only one minor component of the EIR's cumulative impacts analysis. Indeed, this attempt to measure the project's contribution to the erosion of the Bar was a supplemental component of the Final EIR that was added to reinforce the impact conclusions previously reached in the 2011 Revised Draft EIR. Thus, the Final EIR bears little resemblance to the cursory analysis of the cumulative ozone impacts that was found lacking in *Kings County*, *supra*, 221 Cal.App.3d 692. It did not employ a misleading ratio *to avoid* addressing the complex issue of sediment erosion. Rather, as reflected in our discussion above, it analyzed pertinent studies regarding sediment transport and resulting erosion which substantially supported its conclusion that there was insufficient proof that this type of mining activity has a significant impact on the erosion of the Bar and coastal beaches.

### 3. EIR Circulation Requirement

Baykeeper contends that the SLC violated CEQA by failing to recirculate the Final EIR because the 2012 Barnard articles and the CHE supplemental modeling and analysis constituted significant new information about the causal link between sediment transport and coastal erosion.

17

"The Guidelines describe the types of 'significant new information' requiring recirculation of a draft EIR.  (Guidelines, § 15088.5, subd. (a).)  These include disclosure of '[a] new significant environmental impact,' '[a] substantial increase in the severity of an environmental impact,' and the addition of a 'feasible project alternative or mitigation measure considerably different from the others previously analyzed.'  (Guidelines, § 15088.5, subd. (a)(1)–(3).)  The Guidelines state that '[n]ew information added to an EIR is not "significant" unless the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a substantial adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect . . . .'  (Guidelines, § 15088.5, subd. (a).)"  (*Treasure Island*, *supra*, 227 Cal.App.4th at p. 1063.)

"[C]ourts must defer to an agency's explicit or implicit decision not to recirculate a draft EIR so long as it is supported by substantial evidence.  [Citations.]  Indeed, . . . an agency's determination not to recirculate is given 'substantial deference' and is presumed 'to be correct.' "  (*Treasure Island*, *supra*, 227 Cal.App.4th at pp. 1063-1064.)  Thus, the appellant bears the burden of proving substantial evidence does not support the agency's decision not to recirculate an EIR.  (*Western Placer Citizens for an Agricultural & Rural Environment v. County of Placer* (2006) 144 Cal.App.4th 890, 903.)

In the present case, substantial evidence supports the SLC's decision not to recirculate the Final EIR.  The 2012 Barnard articles and the supplemental CHE study were relevant to the scientific controversy regarding the impact of sand mining on coastal erosion.  However, that controversy had been fully disclosed and considered in the 2011 Revised Draft EIR, and this new information did not alter any of the substantive conclusions about the controversy itself or the significance of the impacts of this project on coastal erosion.  Both the 2011 Revised Draft EIR and the Final EIR stated that the reduction of sediment from the Bay-Delta estuary is a possible and plausible cause of the erosion of the San Francisco Bar, but posited that there is a missing causal link between the erosion or removal of sediment in different parts of the estuary and the reduction of the supply of sediment from the Bay-Delta estuary to the San Francisco Bar.  Crucially,

18

both versions of the report concluded that, in any event, the project would not have a significant project specific or cumulative impact on sediment transport or coastal erosion.

Baykeeper's interpretation of the new studies is fundamentally different than the interpretation adopted by the SLC. It views the 2012 Barnard articles as establishing an undeniable connection between sand mining and coastal erosion and the supplemental CHE modeling as disclosing for the first time that the project will have a measurable quantifiable impact on sediment transport and coastal erosion. We will not endeavor to resolve the parties' lengthy argument about the proper interpretation of these studies and their implications with respect to the controversy regarding the effect of sand mining on coastal erosion. "Disagreement among experts does not make an EIR inadequate, but the EIR should summarize the main points of disagreement among the experts." (Guidelines, § 15151.) As discussed above, the 2011 Revised Draft EIR thoroughly addressed the controversy about impacts of sand mining on sediment transport and coastal erosion. The new studies discussed in the Final EIR did not significantly alter the main points of disagreement. Therefore, the SLC's decision not to recirculate is supported by substantial evidence.

### D. Impacts on Mineral Resources

Seeking de novo review, Baykeeper contends that the SLC misconstrued CEQA provisions governing proper analysis of project impacts on mineral resources.

#### 1. Background

The final EIR evaluated "the potential loss of availability of known mineral resources, including sand and construction aggregate associated with the proposed [project] over the next 10 years." This analysis was limited to minerals within sediments on or under the Bay floor, of which only two were identified: (1) sand and gravel deposits valuable as construction aggregate or construction fill material; and (2) oyster shells that have been commercially mined for their mineral content since 1924. To measure the impacts of the project on these two mineral resources, the EIR used threshold of significance criteria that are set forth in appendix G of the CEQA Guidelines (Appendix G).

19

Appendix G is an "Environmental Checklist Form" that agencies use to evaluate the potential environmental impacts of a project.  (Guidelines, Appen. G; see, e.g., *Oakland Heritage Alliance v. City of Oakland* (2011) 195 Cal.App.4th 884, 896 & fn. 5 (*Oakland Heritage Alliance*).)  To assess project impacts on "Mineral Resources," Appendix G asks whether the project would: "a) Result in the loss of availability of a known mineral resource that would be of value to the region and the residents of the state?" or "b) Result in the loss of availability of a locally-important mineral resource recovery site delineated on a local general plan, specific plan or other land use plan?" (Guidelines, Appen. G.)

According to the Final EIR, these threshold criteria "reflect State and local policy that recognizes the importance of mineral resources in meeting society's needs and [are] intended to ensure the disclosure of a proposed project's potential to preclude mineral extraction, for example by developing a land use over or adjacent to a deposit of mineral resources that was incompatible with or that would preclude future mining activities."

Applying these criteria, SLC staff determined that oyster shell deposits are located far from the lease areas in the shallow southern reaches of the Bay.  Thus, the Final EIR concluded that the proposed operations "would not interfere with mining of these known oyster shell beds nor would they preclude the future development of mineral resources other than sand, should such resources be identified within any of the lease areas in the future."

With respect to sand—the object of the mining project—SLC staff acknowledged that an additional 10 years of sand mining would reduce the amount of sand that would be available for future mining in most of the lease areas.  It also found that the mining of a nonrenewable mineral resource will generally deplete that resource.  However, staff concluded that the purpose of a CEQA impact analysis was not to assess whether mining would deplete the mined resource, but rather whether the project would interfere with important mineral resource deposit areas that should be conserved for purposes of extraction of the valued mineral and not be lost to an incompatible use.  Because the

20

project was compatible with this environmental goal, the SLC concluded it did not have a significant adverse impact on known mineral resources.

One of the Master Responses in the Final EIR addressed multiple comments the SLC received about the project impacts on mineral resources. In that response, SLC staff rejected the contention that Appendix G required it to assess whether the project will deplete a sand resource, reiterating that mining "is inherently not a sustainable activity: it extracts raw materials from the earth at a ratio greater than the natural processes that created the raw material." Furthermore, the SLC maintained that the "commonly used interpretation of the [Appendix G] significance criteria for Mineral Resources impacts" calls for an examination of "the potential for [the] proposed project to interfere with or prevent mineral extraction." For example, a housing development blocking access to a known mineral deposit would have a significant impact on that resource. Here, by contrast, the project does not propose to limit access to or limit the availability of a known mineral resource.

### 2. Analysis

Baykeeper contends that the SLC committed a prejudicial abuse of discretion by misconstruing the Appendix G thresholds for measuring impacts on mineral resources. According to Baykeeper, the plain language of those standards mandated that the Final EIR evaluate the impact resulting from the allegedly permanent depletion of sand minerals. We disagree with this argument for at least three reasons.

First, Baykeeper misconstrues the function of Appendix G by treating it as part of the CEQA statute. "[T]he Guidelines make clear that the checklist form in appendix G is 'only suggested, and public agencies are free to devise their own format for an initial study.' (Guidelines, § 15063, subd. (f).) Furthermore, 'CEQA grants agencies discretion to develop their own thresholds of significance (CEQA Guidelines, § 15064, subd. (d)).' [Citation] 'To require any deviation from [the standards of significance in appendix G] to be documented and justified . . . is to elevate Appendix G from a suggested threshold to the presumptive threshold. This flatly contradicts both CEQA's description of Appendix G as only suggested and CEQA's mandate that agencies have the power to

21

devise their own thresholds.' [Citation.]" (*Rominger v. County of Colusa* (2014) 229 Cal.App.4th 690, 716.)

Second, Baykeeper fails to provide authority supporting its interpretation of the Appendix G thresholds pertaining to mineral resources. The Final EIR's use of the Appendix G standards to measure impacts on *accessibility* to a known mineral resource that would be valuable to the region or locality is consistent with state policies regarding the regulation of land uses that are incompatible with mineral extraction. (See, e.g., § 2711, subd. (a) ["the extraction of minerals is essential to the continued economic well-being of the state and to the needs of the society"]; § 2711, subd. (d) ["the production and development of local mineral resources that help maintain a strong economy and that are necessary to build the state's infrastructure are vital to reducing transportation emissions that result from the distribution of hundreds of millions of tons of construction aggregates that are used annually in building and maintaining the state"]; § 2790 [authorizing the State Geologist to designate geographic areas as areas of statewide or regional significance in order to prevent premature development incompatible with the "advantages that might be achieved from extraction of the minerals of the area"].)

Finally, " ' "[t]he substantial evidence standard is applied to conclusions, findings and determinations. It also applies to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions." [Citation.]' " (*Oakland Heritage Alliance*, *supra*, 195 Cal.App.4th at p. 898.) Here, the conclusion in the Final EIR that the mining activities authorized by the project will not have a significant adverse impact on mineral resources is supported by evidence that the project will not lead to the loss of the availability of a mineral resource, but instead will provide the citizens of this state with access to that very resource.

Baykeeper disputes this last point, arguing that the depletion of Bay sand authorized by the project will necessarily have "significant, permanent effects" on the availability of mineral resources because the project "will preclude the mining of this resource by any other entity, at any other time." But this theory is premised on

22

Baykeeper's interpretation of the Appendix G thresholds, which would measure the depletion of a mineral resource, rather than the interpretation of these CEQA thresholds that the SLC applied, which considered *availability in terms of access*. For the reasons discussed above, Baykeeper has failed to establish that CEQA required the SLC to adopt Baykeeper's interpretation of Appendix G.

### E. Notice and Consultation

Baykeeper contends that the SLC violated CEQA by failing to consult with the Coastal Commission and the City of San Francisco before it certified the Final EIR.

#### 1. CEQA Requirements

CEQA requires that the lead agency consult with all responsible agencies and trustee agencies before determining whether an EIR is required for a project. (§ 21080.3.) " 'Trustee agency' means a state agency that has jurisdiction by law over natural resources affected by a project, that are held in trust for the people of the State of California." (§ 21070.) Upon determining that a project requires preparation of an EIR, the lead agency "shall" send notice of that determination (i.e., the NOP) "by certified mail or an equivalent procedure to each responsible agency, the Office of Planning and Research, and those public agencies having jurisdiction by law over natural resources affected by the project that are held in trust for the people of the State of California." (§ 21080.4.)

CEQA further requires that before completing the EIR, the lead agency "shall consult with, and obtain comments from, each responsible agency, trustee agency, any public agency that has jurisdiction by law with respect to the project, and any city or county that borders on a city or county within which the project is located . . . ." (§ 21104.)

#### 2. Analysis

Baykeeper contends that the SLC failed to comply with notice and consultation requirements applicable to trustee agencies because it did not consult with the California Coastal Commission before deciding to prepare an EIR for the project (§ 21080.3), provide the Coastal Commission with notice of the 2007 NOP (§ 21080.4), or consult

23

with that agency at any time prior to certifying the Final EIR (§ 21104).  Without independent analysis, Baykeeper also contends the SLC violated section 21104 by failing to consult with the City of San Francisco before it certified the Final EIR.

The SLC first contends that the Coastal Commission was not a trustee agency for this project because its jurisdiction is limited to the "coastal zone" (§ 30103), while this project is located outside that zone in the middle of the Bay.  However, the fact that the project location is outside the coastal zone is beside the point because the pertinent inquiry for identifying a trustee agency is whether the project will have an effect on natural resources over which the state agency has jurisdiction.  (§ 21070.)  Here, the Final EIR explicitly acknowledged that this sand mining project would have a tenuous although ultimately insignificant effect on coastal erosion.

Alternatively, the SLC contends that it substantially complied with CEQA's notice and consultation requirements because the record establishes that both the Coastal Commission and the City received actual notice of the preparation of an EIR for this project, had the opportunity to comment on the project, and ultimately declined to do so.

To support this substantial compliance theory, the SLC invokes Guidelines section 15207, which states:  "If any public agency or person who is consulted with regard to an EIR or negative declaration fails to comment within a reasonable time as specified by the lead agency, it shall be assumed, absent a request for a specific extension of time, that such agency or person has no comment to make."  In *Citizens for East Shore Parks*, *supra*, 202 Cal.App.4th 549, the appellate court applied Guidelines section 15207 to find that CEQA's consultation requirements were not violated in a case in which the SLC provided responsible agencies with notice and a copy of a draft EIR, asked for comments within 45 days, and neither agency responded.  (*Id*. at pp. 567-568.)  In this case, however, Guidelines section 15207 does not support the SLC's substantial compliance argument.

In contrast to *Citizens for East Shore Parks*, *supra*, 202 Cal.App.4th at page 567, the record before us does not show that the SLC attempted to consult with either the City or the Coastal Commission before it approved this project.  The SLC cites to evidence

24

that the City received actual notice of the 2007 NOP, but does not even contend the City was provided with any version of the EIR. Furthermore, the record reflects that the State Clearinghouse provided a copy of the 2010 Draft EIR to "selected state agencies for review," that the Coastal Commission was one of those agencies, and that "no state agencies submitted comments" on the 2010 Draft EIR.[5] However, the Coastal Commission was not provided with the 2011 Revised Draft EIR, which contained indisputably significant new information about coastal erosion, the very impact that affected its jurisdiction.

Courts have found that " ' "[f]ull compliance with the letter of CEQA is essential to the maintenance of its important public purpose." [Citation.] ' "[W]e must be satisfied that [administrative] agencies have fully complied with the procedural requirements of CEQA, since only in this way can the important public purposes of CEQA be protected from subversion." [Citation.]' " (*Schenck v. County of Sonoma* (2011) 198 Cal.App.4th 949, 959 (*Schenck*).) By the same token however, a violation of CEQA notice and consultation requirements requires reversal only upon proof of prejudice. (*Id.* at p. 959.) "The 'error is prejudicial where failure to comply with the law results in "a subversion of the purposes of CEQA by omitting information from the environmental review process . . . ." ' [Citation.]" (*Ibid.*; see also § 21005, subd. (a).)

In its appellant's opening brief, Baykeeper characterizes the failure to consult with the City and Coastal Commission as a prejudicial abuse of discretion, but it does not identify any information that was omitted from the environmental review process that would have been provided by these other agencies. In its reply brief, Baykeeper contends that the Coastal Commission would have provided crucial information about the impacts of the project on coastal erosion if had it been given the opportunity to consult. Finding no evidence to support this argument in the appellate record, Baykeeper requests that this court take judicial notice of a January 2015 letter from members of the Coastal

---

[5] Guidelines section 15087, subdivision (f) states: "Public agencies shall use the State Clearinghouse to distribute draft EIRs to state agencies for review and should use areawide clearinghouses to distribute the comments to regional and local agencies."

Commission staff to the executive director of the San Francisco Bay Conservation and Development Commission (BCDC) regarding an application that Hanson filed with the BCDC for 10-year mining permits it needs to move forward with the project (the January 2015 letter). The January 2015 letter recommends that permits for Hanson's project be limited and monitored in recognition of its effect on the eroding coastal system and the limited sources of new sand. It also discusses the Final EIR for the project and disagrees with some of the SLC's conclusions regarding the effects of sand mining on coastal erosion.

Baykeeper contends the January 2015 letter is relevant to establish that violations of CEQA's notice and consultation requirements precluded "relevant information from being presented" to the SLC (quoting § 21005, subd. (a)), and it requests that this court take judicial notice of the letter as an official act of the executive branch. (See Evid. Code, § 452.) Without resolving the parties' dispute as to whether the January 2015 letter was an official act, we deny the request for judicial notice because Baykeeper fails to substantiate its theory of relevancy. (*Golden Gate Land Holdings LLC v. East Bay Regional Park Dist*. (2013) 215 Cal.App.4th 353, 366 ["Only relevant evidence is admissible by judicial notice."].)

The primary problem with Baykeeper's theory is that the January 2015 letter expresses current opinions of Coastal Commission staff as opposed to opinions it held prior to October 2012 when the SLC completed its five-year environmental review of this project. Indeed, the only record evidence on this issue shows that the Coastal Commission had the opportunity to comment on the 2010 Draft EIR in 2010 and elected not to do so.

Arguably, the additional information in the 2011 Revised Draft EIR about the controversy regarding the effect of sand mining on coastal erosion might have stimulated the Coastal Commission to comment on the project. However, even if we make this assumption, the January 2015 letter is not relevant absent some proof that it contains *material information* that should have been considered during the environmental review process. (*Schenck*, *supra*, 198 Cal.App.4th at p. 960 ["The critical factor is that even

26

without notice to the [agency] the information gathering and presentation mechanisms of CEQA were not subverted or even compromised."].)

Here, the record demonstrates that the issue of coastal erosion was thoroughly explored during the CEQA review process, not just by SLC staff, but by interested citizens and agencies including the BCDC. Baykeeper does not identify any material information in the January 2015 letter that was actually available at the time the SLC conducted its CEQA review, and yet not considered by the SLC as part of its review.

Thus, we conclude that the appellate record shows that the SLC violated CEQA requirements designed to ensure that it consult with affected agencies including the California Coastal Commission and the City of San Francisco. However, Baykeeper's failure to demonstrate that these violations resulted in the omission of pertinent information from the environmental review process requires that we reject its contention that there was a prejudicial violation of CEQA notice and consultation requirements in this case.

## IV.
## PUBLIC TRUST DISCUSSION

### A. *Issue on Appeal*

As our factual summary reflects, there is no dispute that the project authorizes the private use of land that is protected by the public trust. "When California became a state in 1850 it succeeded to sovereign ownership of various tidelands and submerged lands under the terms of the common law trust doctrine." (*Western Oil & Gas Assn. v. State Lands Com.* (1980) 105 Cal.App.3d 554, 562 (*Western Oil & Gas*).)

The question on appeal is whether the SLC violated the public trust doctrine by failing to consider whether the sand mining leases constitute a permissible use of public trust property. Conceding that it did not conduct an inquiry or make findings under the public trust doctrine, the SLC takes the position that, as the public trustee of submerged lands under the Bay, it had plenary authority to approve the mining leases without making any findings under the public trust doctrine.

27

### B. Guiding Principles

"The public trust doctrine, which is traceable to Roman law, rests on several related concepts. First, that the public rights of commerce, navigation, fishery, and recreation are so intrinsically important and vital to free citizens that their unfettered availability to all is essential in a democratic society. [Citation.] 'An allied principle holds that certain interests are so particularly the gifts of nature's bounty that they ought to be reserved for the whole of the populace. . . . [¶] Finally, there is often a recognition, albeit one that has been irregularly perceived in legal doctrine, that certain uses have a peculiarly public nature that makes their adaptation to private use inappropriate.'. . . [Citation.]" (*Zack's, Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1175-1176, fn. omitted (*Zack's*).)

The United States Supreme Court announced the public trust doctrine in *Illinois Central Railroad v. Illinois* (1892) 146 U.S. 387 (*Illinois Central*), which is still the primary authority elucidating its function and purpose. (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 437 (*National Audubon*).) *Illinois Central* established that "the title which a State holds to land under navigable waters is . . . held in trust for the people of the State, in order that they may enjoy the navigation of the waters and carry on commerce over them, free from obstruction or interference by private parties; that this trust devolving upon the State in the public interest is one which cannot be relinquished by a transfer of the property; that a State can no more abdicate its trust over such property, in which the whole people are interested, so as to leave it under the control of private parties, than it can abdicate its police powers in the administration of government and the preservation of the peace; and that the trust under which such lands are held is governmental so that they cannot be alienated, except to be used for the improvement of the public use in them." (*Long Sault Development Co. v. Call* (1916) 242 U.S. 272, 278-279.)

"While the public trust doctrine has evolved primarily around the rights of the public with respect to tidelands and navigable waters, the doctrine is not so limited." (*Center for Biological Diversity, Inc. v. FPL Group, Inc*. (2008) 166 Cal.App.4th 1349,

1360 (*Center for Biological Diversity*).)  More than " 'a set of rules about tidelands,' " or " 'a restraint on alienation by the government,' " this doctrine functions " 'largely as a public property right of access to certain public trust natural resources for various public purposes.' [Citation.]" (*Ibid.*)  Thus, the doctrine protects "expansive public use of trust property." (*Ibid.*)

The range of public trust uses is broad, encompassing not just navigation, commerce, and fishing, but also the public right to hunt, bathe or swim.  (*City of Berkeley v. Superior Court* (1980) 26 Cal.3d 515, 521 (*City of Berkeley*).)  Furthermore, the concept of a public use is flexible, accommodating changing public needs.  (*National Audubon*, *supra*, 33 Cal.3d at p. 434.)  For example, an increasingly important public use is the preservation of trust lands "in their natural state, so that they may serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the scenery and climate of the area.' [Citation.]" (*Id*. at pp. 434-435.)

The public trust is also "more than an affirmation of state power to use public property for public purposes.  It is an affirmation of the duty of the state to protect the people's common heritage of streams, lakes, marshlands, and tidelands, surrendering that right of protection only in rare cases when the abandonment of that right is consistent with the purposes of the trust." (*National Audubon*, *supra*, 33 Cal.3d at p. 441.)  Thus, the state or trustee has "an affirmative duty to take the public trust into account in the planning and allocation of [trust] resources, and to protect public trust uses whenever feasible." (*Id*. at p. 446, fn. omitted.)

"Where . . . the propriety of a governmental relocation of trust land from one public use to another is placed in question, the seminal opinion in *Illinois Central*, *supra*, 146 U.S. 387, makes clear that courts should 'look with considerable skepticism upon any governmental conduct which is calculated either to reallocate that resource to more restricted uses or to subject public uses to the self-interest of private parties.' [Citation.] Trust lands may be devoted to purposes unrelated to the trust if such purposes are incidental to and accommodate trust uses but . . . there are limits on the legislative

authority to free use of trust land for nontrust purposes." (*Zack's*, *supra*, 165 Cal.App.4th at p. 1176, italics omitted.)

There is no set "procedural matrix" for determining state compliance with the public trust doctrine. (*Citizens for East Shore Parks*, *supra*, 202 Cal.App.4th at pp. 576-577.) However, "[a]ny action which will adversely affect traditional public rights in trust lands is a matter of general public interest and should therefore be made only if there has been full consideration of the state's public interest in the matter; such actions should not be taken in some fragmentary and publicly invisible way. Only with such a safeguard can there b[e] any assurance that the public interest will get adequate public attention.' [Citation.]" (*Zack's*, *supra*, 165 Cal.App.4th at pp. 1188-1189.)

*C. Analysis*

Applying the principles summarized above, we conclude that the SLC's authority to approve private sand mining leases of public trust property carries with it an "affirmative duty to take the public trust into account . . . and to protect public trust uses whenever feasible." (*National Audubon*, *supra*, 33 Cal.3d at p. 446, fn. omitted.) The appellate record, jointly prepared by the parties, does not demonstrate that the SLC fulfilled that duty in this case.

The SLC acknowledges that it did not make any findings about this project under the public doctrine, implicitly conceding that it did not consider whether Hanson's mining project is a proper use of trust property. Nevertheless, the SLC takes the position that it did not violate the public trust doctrine for three reasons: First, sand mining is indisputably a public trust use of sovereign land; second, even if the mining leases are not a public trust use, the public trust doctrine does not apply to mineral extraction leases which do not permanently alienate the trust res; and finally, CEQA review eliminates the obligation to consider whether a project violates the public trust. We will separately address the flaws in each of these theories.

**1. Private Sand Mining Is Not Per Se a Public Trust Use**

The SLC contends that it was not required to consider whether the project violates the public trust doctrine because sand mining is categorically a public trust use and, in

30

*National Audubon*, *supra*, 33 Cal.3d 419, our Supreme Court expressly confirmed that the public trustee has sole discretion to prefer one public trust use over any other.

In *National Audubon*, *supra*, 33 Cal.3d 419, plaintiffs argued that permits authorizing the Department of Water and Power of the City of Los Angeles to divert water from Mono Lake violated the public trust doctrine. The Attorney General defended the permits as a valid public trust use of the lake property which met the water needs of Los Angeles residents, and argued that the public trust doctrine did not prevent the state "from choosing between trust uses." (*Id*. at p. 440.) The *National Audubon* court rejected this argument and remanded the case for administrative review under the public trust doctrine. In reaching its decision, our Supreme Court affirmed the state's authority to chose between trust uses, but it rejected the Attorney General's improper attempt to "maximize state power under the trust" by adopting an overbroad concept of trust uses that would encompass "all public uses, so that in practical effect the doctrine would impose no restrictions on the state's ability to allocate trust property." (*Ibid*.) Although the court did not articulate a single test for identifying a valid public trust use, it approved authority holding that trust uses "relate to uses and activities in the vicinity" of the trust property at issue. In doing so, it explicitly rejected the idea that the state is free to alienate trust property solely because the grant would serve "some public purpose, such as increasing tax revenues, or because the grantee might put the property to a commercial use." (*Ibid*.)

In the present case, the SLC's argument that it has unfettered discretion to prefer sand mining as a preauthorized public trust use of the lease parcels rests on the same overbroad concept of trust uses that was rejected in *National Audubon*—it takes the position that extraction of a mineral resource for commercial purposes is a public use because it serves a public need for construction grade sand. However, a use does not qualify as a trust use simply because it might confer a public benefit. (*National Audubon*, *supra*, 33 Cal.3d at p. 440; see also *Zack's*, *supra*, 165 Cal.App.4th at p. 1176 [distinguishing the state's trust obligations from its general obligation to act for the public benefit].) The scope of this public right is expansive and flexible in order to

31

accommodate changing needs. (*National Audubon*, *supra*, 33 Cal.3d at p. 434; *City of Berkeley*, *supra*, 26 Cal.3d at p. 521 [doctrine encompasses broad range of "public uses"].) But, by its very essence, a public trust use facilitates public access, public enjoyment, or public use of trust land. (*Ibid*.; *Center for Biological Diversity*, *supra*, 166 Cal.App.4th at p. 1360 [doctrine confers a public property right of access to trust resources].) The private activity of removing valuable soil sediment for commercial profit from beneath the Bay does not necessarily comport with that definition.

The SLC contends that courts have recognized that the production of mineral resources for commercial purposes constitutes a public trust use of state land since 1928 when our Supreme Court decided *Boone v. Kingsbury* (1928) 206 Cal. 148 (*Boone*). The issue in *Boone* was whether a statute violated the public trust doctrine by authorizing the granting of permits to California residents to prospect for oil and gas on "tidal and submerged lands and to lease the same on a royalty basis." (*Id*. at p. 154.) The *Boone* court held the Legislature had "fully considered all questions of fact and policy germane to the subject, and found that oil-wells could be operated in the soil of the ocean without substantially impairing any of the rights for which said lands are held in trust for the benefit of the state." (*Id*. at p. 193.) In reaching this decision, the court found, among other things, that evidence in the record was sufficient to establish that the mining activities authorized by the statute would not substantially interfere with navigation or fishery. The court also found that the interception of oil, gas and mineral deposits that could be reduced to useful purposes would be a value to commerce and that gasoline, in particular, was "so closely allied with state and national welfare as to make its production a matter of state and national concern" and a clear " 'public benefit.' " (*Id*. at p. 181.)

The SLC interprets *Boone* as establishing a rule that mineral extraction is per se a public trust use of sovereign lands. We disagree with this interpretation for two independent reasons. First, the SLC relies exclusively on excerpts from *Boone* discussing the commercial and public benefits of oil drilling. (See *Boone*, *supra*, 206 Cal. at p. 181.) Even if that discussion could be construed as a formal holding that oil drilling is a public use, *Boone* did not address the fundamentally different activity of sand mining under the

32

San Francisco Bay.  Indeed, as the *Boone* case illustrates, the Legislature views oil and gas drilling differently from other types of mining activities.  (See, e.g., § 6830.1 [legislative finding "that the people of the State of California have a direct and primary interest in assuring the production of the optimum quantities of oil and gas from lands owned by the state, and that a minimum of oil and gas be left wasted and unrecovered in such lands"].)

Second, and in any event, the *Boone* court did not actually characterize any private mining activity as a public use of trust property, but instead affirmed a legislative determination that the highly regulated private mining activities authorized by the challenged statute did not interfere with the public trust.  (*Boone*, *supra*, 206 Cal. at p. 193.)  Since no comparable findings were made in this case, the SLC's heavy reliance on *Boone* is misplaced.

The SLC suggests that the Legislature has conclusively determined that sand mining is a public use of trust property because it has made a "specific finding that the extraction of minerals is 'essential' for the commercial well-being of California."  To support this argument, the SLC cites section 2711, subdivision (a), which states in full: "The Legislature hereby finds and declares that the extraction of minerals is essential to the continued economic well-being of the state and to the needs of the society, and that the reclamation of mined lands is necessary to prevent or minimize adverse effects on the environment and to protect the public health and safety."  But, section 2711 is a provision of the Surface Mining and Reclamation Act of 1975 (§§ 2710, et seq.), a law which does not regulate mining activities on state lands subject to the public trust.  To the extent legislative findings under that 1975 Act are relevant here, the SLC overlooks the legislative finding that "the state's mineral resources are vital, finite, and important natural resources and the responsible protection and development of these mineral resources is vital to a sustainable California."  (§ 2711, subd. (f).)

The SLC also fails to acknowledge that the Legislature has addressed the subject of public lands in a separate division of the Public Resources Code.  (§ 6001 et seq.)  As noted above, in this pertinent part of the code, the Legislature has distinguished oil and

gas leases from other types of mineral extraction leases, and adopted a specific policy to promote the state's interest in oil and gas mining. (§ 6830.1.) Leases for the extraction of minerals other than oil and gas from tide and submerged lands are governed by section 6900, which authorizes the SLC to grant such leases "when it appears to be in the public interest" and when "it appears that the execution of such leases and the operations thereunder will not interfere with the trusts upon which such lands are held or substantially impair the public rights to navigation and fishing." Therefore, although the Legislature has conferred authority on the SLC to approve sand mining leases, it did not find that sand mining is a public use or an automatically authorized use of trust land.

The SLC also contends that public trust case law supports a broad definition of "commerce," which includes activities that have both a private and public benefit. However the authority it cites only reinforces the distinction between a public trust use and a private use which is deemed valid because it is does not interfere with the purposes of the public trust doctrine. (See, e.g., *Martin v. Smith* (1960) 184 Cal.App.2d 571, 577-578.) The SLC's authority to approve a private lease of sovereign land for a commercial purpose which is consistent with the public trust is not in dispute. (*Ibid*.) However, we are not convinced by the SLC's much broader claim that it was "free" to approve the leases of public trust land in this case without any consideration of the public trust doctrine because sand mining is intrinsically a public trust use.

Finally, the SLC makes the factual argument that Hanson's mining operation fits within the traditional trust uses of navigation and commerce because a tug and barge are used to reach the mining site, to dredge the sand, and to transport it for commercial purposes. The SLC maintains that a "more water-dependent and navigational use could hardly be imagined." But this factual argument highlights the flawed definition of a public trust use which runs throughout the SLC's arguments in this appeal. The trust doctrine protects and promotes *public uses* including commerce and navigation. It cannot justify the private use of public property on the basis that the private party engaged in a water dependent activity for its own private commercial purpose. Rather such a private

34

use is permissible only if it is consistent with the protections afforded by the public trust doctrine.

The SLC's broad concept of a public trust use as encompassing any private activities that benefit commerce is unsupported by case law and inconsistent with the guiding principles we discuss above. Therefore, we reject its theory that commercial sand mining of submerged lands under the San Francisco Bay automatically qualifies as a public trust use.

### 2. The Public Trust Doctrine Applies To Mining Leases

The SLC argues in the alternative that "the *National Audubon* analysis does not apply" to SLC decisions to authorize mining leases. To support this alternative argument, the SLC offers the following theory: Because the *National Audubon* court analyzed water diversion permits that had the effect of alienating permanently a public trust resource, that court's holding that the public trust doctrine imposes affirmative duties on the state or its trustee applies *only* in cases which involve a permanent alienation of a trust resource. Thus, the SLC contends, since mineral extraction is not a permanent alienation of the trust res (citing *Boone*, *supra*, 206 Cal. at p. 182), a mining lease does not trigger the affirmative trust duties discussed in *National Audubon*, *supra*, 33 Cal.4th at page 438.

First, we are not persuaded by the SLC's factual contention that Bay sand mining does not deplete a trust resource. *Boone*, *supra*, 206 Cal. at page 182 is inapposite, as that case involved oil drilling as opposed to sand mining. Furthermore, during its CEQA review of this project, the SLC acknowledged that sand mining does deplete a trust resource. As discussed in the first part of our opinion, the Final EIR's assessment of project impacts on mineral resources examined the potential for the project to interfere with or prevent access to mineral extraction, but it did not evaluate whether the project would deplete a mineral resource because SLC staff concluded that sand mining "is inherently not a sustainable activity; it extracts raw materials from the earth at a rate greater than the natural processes that created the raw material." This conclusion was supported by findings in the Final EIR that the additional 10 years of sand mining in the

35

lease areas would reduce the amount of sand that would be available in the future and that, for practical purposes, the mined sand was not a renewable resource. While these findings supported the impacts analysis on mineral resources under CEQA, they appear to undermine the SLC's theory that it had no independent duties under the public trust doctrine.

Second, the SLC's legal theory that mining leases are exempt from public trust analysis is not sustainable under the legal authorities cited. *Boone* does not hold or even suggest that mineral extraction activities on trust land are exempt from the requirements of the public trust doctrine. Rather, as discussed above, the record in that case confirmed that the Legislature fulfilled its affirmative duty to take the trust into account when it enacted a statute which authorized limited private mining for oil on public trust land. (*Boone*, *supra*, 206 Cal. at p. 193.) Indeed, the *National Audubon* court described *Boone* as "[a]pplying the principles of *Illinois Central*" to uphold the statute in that case "on the ground that the [oil] derricks would not substantially interfere with the trust." (*National Audubon*, *supra*, 33 Cal.4th at p. 439.) Thus, our conclusion that a private use of trust property triggers affirmative obligations under the trust doctrine is consistent with both *National Audubon* and *Boone*.

Our conclusion is also consistent with the provisions of the Public Resources Code which confer the SLC's public trust jurisdiction. (§ 6001 et seq.) The SLC's jurisdiction over ungranted submerged lands derives from section 6301, which provides that the SLC "may lease or otherwise dispose of [trusts] lands, as provided by law." (§ 6301.) Thus, the SLC is not exempt from the law, but must comply with the requirements of the common law trust doctrine when administering trust lands. (See, e.g., *Citizens for East Shore Parks*, *supra*, 202 Cal.App.4th at p. 571 [SLC, "acting on behalf of the state, can lease tidelands and submerged lands for such uses consistent with the trust"].) The SLC's trust obligations are also reflected in statutory provisions regulating the leasing of public lands. (See, e.g., § 6895 ["whenever the lands for which a lease is sought are tide and submerged lands, the [SLC] may divide the lands into the size and number of parcels as the [SLC] determines will not substantially impair the public rights to navigation and

36

fishing or interfere with the trust upon which the lands are held"]; § 6900 [authorizing mineral extraction leases from tide and submerged lands that are in the public interest which "will not interfere with the trusts upon which such lands are held or substantially impair the public rights to navigation and fishing"].)

For all these reasons, we conclude that Hanson's application for 10-year sand mining leases on sovereign lands did trigger the SLC's affirmative duty under *National Audubon*, *supra*, 33 Cal.3d at page 446, "to take the public trust into account . . . and to protect public trust uses whenever feasible." (Fn. omitted.)

### 3. The SLC Failed to Discharge Its Trust Obligations

The SLC maintains it fulfilled its public trust duties by conducting a CEQA review. To support this contention, it cites two cases: *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 776 (*State Water*); and *Citizens for East Shore Parks*, *supra*, 202 Cal.App.4th 549.

*State Water*, *supra*, 136 Cal.App.4th 674 resolved eight appeals and three cross-appeals in seven coordinated cases arising out of a five-year proceeding before the State Water Resources Control Board. That litigation concerned the implementation of a 1995 water quality control plan that was the culmination of a 40-year process to solve water quality problems in the San Francisco Bay/Sacramento-San Joaquin Delta Estuary. (*Id.* at p. 687.) Among the countless interrelated issues addressed in the more than 150 pages of judicial analysis was whether the Water Board violated the public trust doctrine because the 1995 plan did not (1) resolve all conflicts between public trust values and competing water values in favor of the trust, or (2) take every feasible measure to protect the Chinook salmon. (*Id.* at p. 778.)

The *State Water* court rejected this public trust challenge as untimely and unfounded. (*State Water*, *supra*, 136 Cal.App.4th at p. 778.) In implementing the 1995 plan, the Board had considered all demands that were being made on the waters of the Bay-Delta and fulfilled its duties to consider and protect not just fish and wildlife but "all of the other beneficial uses to be made of water in the Bay-Delta." (*Ibid.*) Thus the court found, in dicta, that, to the extent the Water Board implemented the 1995 plan, it also

37

complied with its public trust obligations. However, to the extent that the Water Board failed to implement that plan, appellants were entitled to writ relief and the "public trust doctrine entitle[d] them to nothing more." (*Id*. at p. 779.)

*State Water* is distinguishable from the present case, not just because Baykeeper's public trust challenge is timely, but more crucially because, in contrast to *State Water*, the record of the SLC's CEQA proceeding does not affirmatively demonstrate that it complied with its public trust obligations. Thus, we do not disagree that *State Water* supports the SLC's proposition that "[c]ompliance with other environmental statutes can serve to fulfill an agency's trust obligations." But, *State Water* does not stand for the broader proposition that CEQA review of a project involving sovereign property necessarily satisfies the SLC's public trust obligations.

In *Citizens for East Shore Parks*, *supra*, 202 Cal.App.4th 549, the SLC approved a 30-year lease authorizing Chevron to continue operating a marine terminal on public trust land adjacent to the company's oil refinery. After concluding that the lease renewal did not violate CEQA, the court addressed appellants' separate challenge under the public trust doctrine. Appellants conceded that the maintenance and operation of the marine terminal was "a permissible public trust use," but argued that before the SLC could approve the lease renewal, the public trust doctrine additionally required that it consider other public trust uses of the property and that it impose mitigation measures to reduce to the extent possible the impacts of the project on those other public trust uses. (*Id*. at p. 569.)

The *Citizens for East Shore Parks* court held that "where the Lands Commission continued a permissible and long-standing trust use and conducted adequate review under CEQA, there was no violation of the public trust doctrine." (*Citizens for East Shore Parks*, *supra*, 202 Cal.App.4th at pp. 569-570.) The court reasoned that the additional procedural requirements that appellants proposed were not supported by public trust law. (*Id*. at pp. 576-577.) To the contrary, the court found, "imposing such procedural constraints would be inconsistent with the recognition that the state is free to choose between public trust uses and that selecting one trust use 'in preference to . . . [an]other

38

cannot reasonably be said to be an abuse of . . . discretion. [Citation]" (*Id*. at pp. 576-577.)

The *Citizens for East Shore Parks* court also opined that requirements imposed by regulatory schemes like CEQA can often satisfy the state's obligations under the public trust doctrine. (*Citizens for East Shore Parks*, *supra*, 202 Cal.App.4th at pp. 577-578.) Reasoning that the trust doctrine and CEQA impose similar obligations, the court found that the CEQA review process performed in that case "encompassed discussion of other public trust uses" of the property. (*Id*. at p. 578.) Thus, the court held that when no change is being made to a public trust use and there has been compliance with CEQA, the public trust doctrine does not independently impose an additional impact requirement mandating the consideration of additional project alternatives and mitigation measures in connection with those public trust uses. (*Ibid*.)

In the present case, the SLC characterizes *Citizens for East Shore Parks*, *supra*, 202 Cal.App.4th 549 as "unequivocal" authority that the state satisfies the public trust doctrine by complying with CEQA. We disagree. First, and crucially, there was no dispute in *Citizens for East Shore Parks* that the maintenance and operation of the marine terminal was a public trust use. (*Id.* at p. 569.) Here, by contrast, the question whether Hanson's sand mining operation is a public trust use, or even a trust consistent use, is hotly disputed. Second, the *Citizens for East Shore Parks* court rejected an interpretation of the trust doctrine which *necessarily* would have imposed specific additional impact requirements beyond CEQA that could only be satisfied by separate supplemental analysis. (*Id.* at pp. 569-570.) Here, by contrast, we address the more basic question whether the public trust doctrine imposes any obligation to demonstrate affirmatively that the state has taken the public trust into account when making a decision about the management and use of trust property, whether in the context of a CEQA review or otherwise. Indeed, the record in *Citizens For East Shore Parks* contained affirmative evidence that the CEQA review encompassed a consideration of the public trust doctrine. (*Id.* at p. 578.) Here, by contrast, the record of the CEQA review process does not address the SLC's obligations under the public trust doctrine.

Disputing this last point, the SLC contends that it did fulfill its affirmative duty to consider the public trust in a section of the Final EIR which discussed project impacts on existing land and recreational uses in the area and whether the project was consistent with applicable land use plans and policies. The record citations that the SLC has provided to us consist of excerpts from the Final EIR finding that, without mitigation, the project will conflict with policies in applicable land use plans which require that "sand mining operations be conducted in an environmentally sound manner, that agencies protect public trust resources, and that sand mining operations be carried out in a manner that minimizes interference with critical wildlife activities." The SLC concluded, however, that mitigation measures for other impacts of the project "would also reduce conflicts with applicable land use plans and policies to a less-than-significant level," and therefore, no additional mitigation would be required. These record citations do not demonstrate the SLC fulfilled its public trust obligations during the environmental review process. To the contrary, the brief acknowledgment of the obligation of *other agencies* to protect public trust resources reinforces our conclusion that the SLC did not implicitly consider its *own* obligations under the public trust doctrine as part of its CEQA review of this project.

There may be some activities which unquestionably constitute public trust uses and, by the same token, there may be activities which are so obviously consistent with the public trust so as to require only a cursory consideration of the doctrine. However, private commercial sand mining in the San Francisco Bay does not fall into either of those categories. The length and breadth of appellate argument about the nature and effects of this activity belies the claim each party makes that the law is decisively in its favor. This debate could have been minimized if not avoided had the SLC addressed the public trust doctrine before approving the project. In any event, on this record we cannot find that the SLC fulfilled its obligation to conduct a public trust analysis in the CEQA process. Therefore, a remand for that purpose is required.

# V.

## DISPOSITION

The order denying the petition for writ of mandate is affirmed to the extent it finds that the Final EIR complies with CEQA.  That part of the trial court's order finding that the SLC complied with the public trust doctrine is hereby reversed, and the trial court is directed to grant the writ of mandate to that extent consistent with this opinion.


_____
RUVOLO, P. J.


We concur:


_____
RIVERA, J.


_____
STREETER, J.

41

| | |
|---|---|
| Trial Court: | San Francisco Superior Court |
| Trial Judge: | Hon. Teri L. Jackson |
| Counsel for Appellant: | San Francisco Baykeeper, Inc., George Torgun, Sejal Choksi-Chugh, Erica Maharg |
| | Environmental Law Foundation, James R. Wheaton |
| Counsel for Amicus Curiae Law Professors on Behalf of Appellant: | David R. Owen, Professor of Law and Associate Dean for Research, University Maine School of Law |

Amicus Curiae Law Professors:

Eric Biber, Professor of Law, University of California , Berkeley School of Law

Alejandro E. Camacho, Professor of Law, Director, Center for Land, Environment, and Natural Resources, University of California, Irvine

Joseph F.C. DiMento, Professor of Law, University of California, Irvine

Holly Doremus, James H. House and Hiram H. Hurd Professor of Environmental Regulation; Co-Director, Center for Law, Energy & the Environment; Director, Environmental Law Program, University of California, Berkeley School of Law

Tim Duane, Visiting Professor of Law, University of San Diego School of Law, Professor of Environmental Studies, University of California, Santa Cruz

Daniel A. Farber, Sho Sato Professor of Law; Co-Director, Center for Law, Energy & the Environment, University of California,

Berkeley School of Law
Brian Gray, Professor of Law,
University of California, Hastings
College of Law

Sean B. Hecht, Co-Executive Director,
Emmett Institute on Climate Change and the
Environment, Evan Frankel Professor of Policy
and Practice, UCLA School of Law

Albert C. Lin, Professor of Law, University of
California, Davis School of Law

David R. Owen, Professor of Law and
Associate Dean for Research, University of
Maine School of Law (through June 2015),
Professor of Law, University of California,
Hastings College of Law (beg. July 2015)

Shelley Ross Saxer, Vice Dean and Laure
Sudreau-Rippe Endowed Professor of Law,
Pepperdine Law School

Deborah A. Sivas, Luke W. Cole Professor of
Environmental Law and Director, Environmental
Law Clinic, Stanford Law School

David Takacs, Associate Professor of Law,
University of California, Hastings School
of Law

Jonathan Zasloff, Professor of Law,
UCLA School of Law

Counsel for Respondent:            Kamala D. Harris
                                   Attorney General of California

                                   John A. Saurenman
                                   Senior Assistant Attorney General

                                   Christiana Tiedemann
                                   Supervising Deputy Attorney General

                                   Joseph C. Rusconi
                                   Deputy Attorney General

Counsel for Amicus Curiae          Morrison & Foerster, William M. Sloan
Bay Planning Commission
on Behalf of Respondent:

Counsel for Real Parties in        Downey Brand, Christian L. Marsh,
Interest:                          Arielle O. Harris

A142449, *San Francisco Baykeeper, Inc. v. Calif. State Lands Comm.*