Filed 10/31/18; Certified for publication 11/27/18 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| SAN FRANCISCO BAYKEEPER, INC., Plaintiff and Appellant, v. STATE LANDS COMMISSION, Defendant and Respondent, HANSON MARINE OPERATIONS, INC., et al., Real Parties in Interest. | A151821 (City & County of San Francisco Super. Ct. No. CPF-12-512620) |

## I. INTRODUCTION

For the second time, San Francisco Baykeeper, Inc. (Baykeeper) appeals a decision by the State Lands Commission (SLC) authorizing real party in interest Hanson Marine Operations, Inc. (Hanson) to dredge mine sand from sovereign lands under the San Francisco Bay (Bay) pursuant to 10-year mineral extraction leases (the sand mining project or project).  In 2012, Baykeeper filed the underlying action, seeking a writ of mandate to compel the SLC to set aside its approval of the sand mining project.  In 2015, a different panel of this court found that the SLC's environmental review of the project complied with the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.),[1] but that the SLC violated the public trust doctrine by approving the

---

[1] Subsequent statutory references are to the Public Resources Code, unless otherwise indicated.

1

project without considering whether the sand mining leases were a proper use of public trust lands. (*San Francisco Baykeeper, Inc. v. State Lands Com.* (2015) 242 Cal.App.4th 202 (*Baykeeper I*).)

After *Baykeeper I* was decided, the superior court issued a preemptory writ directing the SLC to reconsider the sand mining project in light of the common law public trust doctrine. The court discharged the writ in April 2017 and this timely appeal followed. Baykeeper contends the SLC violated its duties under the public trust doctrine by reapproving Hanson's sand mining project. We find that the SLC erred by concluding that private commercial sand mining constitutes a public trust use of sovereign lands. However, there is substantial evidence that the project will not impair the public trust, and, on that ground, we affirm the superior court order discharging the peremptory writ.

## II. BACKGROUND

### A. The Sand Mining Project[2]

In 1998, the SLC granted Hanson's predecessor-in-interest 10-year mineral extraction leases, which authorized commercial sand mining from delineated areas under the Central San Francisco Bay, Suisun Bay, and the western Sacramento-San Joaquin River Delta. (*Baykeeper I*, *supra*, 242 Cal.App.4th at p. 211.) The parcels covered by these leases were "all sovereign lands, owned by the State of California subject to the public trust, and managed by the SLC." (*Ibid*.) In 2006, Hanson requested that the SLC grant extensions of several of the leases, but they expired before the SLC made its decision, so Hanson proposed that the SLC grant four new 10-year leases covering essentially the same parcels in the San Francisco Bay that were mined by Hanson's predecessor-in-interest. Hanson sought authorization to remove a maximum of 2.04 million cubic yards of sand per year, using a mining method referred to as dredge

---

[2] *Baykeeper I*, *supra*, 242 Cal.App.4th 202, contains a detailed summary of the sand mining project and its history, which we abbreviate here.

mining to obtain "marine aggregate sand," which is particularly desirable to the construction industry. (*Id.* at pp. 211–212.)[3]

In 2007, the staff of the SLC (SLC Staff) began an environmental review of the sand mining project, which took several years to complete. (*Baykeeper I*, *supra*, 242 Cal.App.4th at pp. 212–216.) A final environmental impact report published in 2012 (the Final EIR) proposed a "Reduced Project Alternative" as an environmentally superior alternative to Hanson's proposal. This alternative would " 'reduce permitted annual mining volumes in all of the lease areas to a level equivalent to the current baseline mining volumes (i.e., the 2002 to 2007 average mined at each Project parcel).' " (*Id.* at p. 213.) SLC Staff recommended this alternative as a way to reduce the intensity of significant environmental impacts and make it easier to implement mitigation measures. (*Id.* at p. 214.)

In October 2012, the SLC certified the Final EIR and approved a revised version of the project referred to as the "Reduced Project Alternative with Increased Volume Option." (*Baykeeper I*, *supra*, 242 Cal.App.4th at p. 214.) The approved version of the project incorporated the Reduced Project Alternative proposed in the Final EIR, but also added an "Option" pursuant to which Hanson could obtain authorization to mine volumes requested in its original proposal by "demonstrating a reduction of the two most significant adverse impacts of the project: (1) the entrainment and mortality of delta and longfin smelt, and (2) the emission of criteria pollutants." (*Ibid.*)

The SLC also issued a "Statement of Overriding Considerations" for the project, finding that its unavoidable significant environmental impacts were outweighed by its benefits, which included "providing jobs, supplying high quality sand to the Bay Area construction industry, and generating substantial royalties for the state." (*Baykeeper I*, *supra*, 242 Cal.App.4th at p. 214.) Moreover, the SLC found "that if the project was not

---

[3] Dredge mining uses a trailing arm hydraulic suction dredge and barge. A tugboat positions the barge "over the mining site, and the hydraulic suction dredge creates a flurry of water and sand, which mobilizes the sand and then pumps it into the barge. A typical mining event lasts approximately three to four hours." (*Baykeeper I*, *supra*, 242 Cal.App.4th at p. 211.)

approved, regional demand for construction aggregate would require obtaining sand from other sources including quarries in the region and imports from Canada, which was feasible but would result in 'greater environmental consequences, particularly air quality impacts.' " (*Ibid*.)

In November 2012, Baykeeper filed the underlying mandate proceeding, alleging that the SLC's approval of the project violated both CEQA and the common law public trust doctrine. (*Baykeeper I*, *supra*, 242 Cal.App.4th at p. 215.) The trial court denied the petition in April 2014. (*Ibid*.) *Baykeeper I* affirmed the trial court's determination that the Final EIR complied with CEQA but reversed a finding that the SLC complied with the public trust doctrine and remanded the case for further proceedings. (*Id.* at p. 243.)

## B.  The Public Trust Discussion in *Baykeeper I*

In *Baykeeper I*, two important facts framed the public trust discussion:  First, by approving Hanson's project, the SLC authorized "the private use of land that is protected by the public trust." Second, the SLC did not make any findings under the public trust doctrine before it approved the project in October 2012. (*Baykeeper I*, *supra*, 242 Cal.App.4th at p. 232.) Thus, the issue on appeal was whether the SLC had authority as public trustee of the submerged lands under the Bay to approve the sand mining project without making any findings under the public trust doctrine. We summarize *Baykeeper I*'s discussion of this issue, with the understanding that its conclusions constitute the law of the case.[4]

---

[4]  Pursuant to the law of the case doctrine " ' "the decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case." ' [Citation.] The doctrine applies to decisions of intermediate appellate courts as well as courts of last resort. The doctrine promotes finality by preventing relitigation of issues previously decided. [Citation.]" (*Sargon Enterprises, Inc. v. University of Southern California* (2013) 215 Cal.App.4th 1495, 1505; see generally Eisenberg et al., Cal. Practice Guide:  Civil Appeals and Writs (The Rutter Group 2016) §14:171 et seq. pp. 14-66 to 14-91 [and authority cited].)

California holds title to submerged lands under the Bay as trustee for the public pursuant to the requirements of the public trust doctrine. (*Baykeeper I*, *supra*, 242 Cal.App.4th at p. 232; see also *Berkeley v. Superior Court* (1980) 26 Cal.3d 515, 521.) This common law doctrine is comprised of a set of principles that protect the public's right to use and enjoy property held within the public trust. (*Ibid.*; see also *Zack's Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1175–1176.) The doctrine is premised on a " ' "public property right of access" ' " to trust lands and "protects 'expansive public use of trust property.' " (*Baykeeper I*, *supra*, 242 Cal.App.4th at p. 233; see also *Center for Biological Diversity, Inc. v. FPL Group, Inc.* (2008) 166 Cal.App.4th 1349, 1360.) While the public trust doctrine is a source of state power over sovereign lands, it also imposes an obligation on the state trustee " 'to protect the people's common heritage of streams, lakes, marshlands and tidelands, surrendering that right of protection only in rare cases when the abandonment of that right is consistent with the purposes of the trust. " ' (*Baykeeper I*, *supra,* 242 Cal.App.4th at p. 234, quoting *National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 441 (*National Audubon*).)

*Baykeeper I* applied these governing principles to conclude that the SLC violated its duty as public trustee by approving Hanson's sand mining project without fulfilling its " 'affirmative duty to take the public trust into account . . . and to protect public trust uses whenever feasible.' " (*Baykeeper I*, *supra*, 242 Cal.App.4th at p. 234, quoting *National Audubon*, *supra*, 33 Cal.3d at p. 446, fn. omitted; see also *Citizens for East Shore Parks v. State Lands Com.* (2011) 202 Cal.App.4th 549, 576 (*Citizens for East Shore Parks*).) *Baykeeper I* also addressed several misconceptions, which had led the SLC to the erroneous conclusion that it was not required to consider the public trust doctrine before approving Hanson's project. (*Baykeeper I*, at pp. 234–235.)

The SLC's primary theory in *Baykeeper I* was that "sand mining is indisputably a public trust use of sovereign land." (*Baykeeper I*, *supra*, 242 Cal.App.4th at pp. 234–235.) It reasoned that the Hanson leases would satisfy a public need for construction grade sand and, therefore, the SLC had unfettered discretion to approve the leases as a

5

"public trust use" of the Bay lands. (*Id*. at p. 235.) The SLC cited *Boone v. Kingsbury* (1928) 206 Cal. 148 (*Boone*) as its case authority, arguing that the Supreme Court had long recognized that private extraction of a mineral resource like sand was a legitimate public trust use. (*Baykeeper I*, at p. 236.) The SLC also argued that the Legislature had settled the matter by declaring that " 'the extraction of minerals is essential to the continued economic well-being of the state and to the needs of the society . . . .' " (*Id*. at p. 237, quoting § 2711, subd. (a) of the Surface Mining and Reclamation Act of 1975.)

*Baykeeper I* rejected every aspect of the SLC's theory that private commercial sand mining constitutes a public trust use of public lands, making four points which are relevant to our resolution of the present appeal. First, in *National Audubon*, *supra*, 33 Cal.3d at page 440, the Supreme Court eschewed overbroad concepts of trust uses that would have the practical effect of giving the state trustee unfettered authority to allocate trust resources without restriction. (*Baykeeper I*, *supra*, 242 Cal.App.4th at p. 235.) Second, controlling authority establishes that a public trust use is not any use that may confer a public benefit, but rather a use that facilitates public access, public enjoyment, or public use of trust land. (*Id*. at pp. 235–236.) Third, *Boone*, *supra*, 206 Cal. 148, is not relevant to this issue because (1) that case involved oil drilling, a fundamentally different activity than sand mining under the Bay, and (2) the *Boone* court did not characterize mining activity of any kind as a public trust use, but rather upheld a statute regulating private oil drilling on public lands pursuant to a finding that the drilling activities did not interfere with the public trust. (*Baykeeper I*, at p. 236.) Fourth, statutes regulating the SLC's authority to grant leases for the extraction of minerals other than oil and gas from trust lands do not characterize mineral mining as "a public use or an automatically authorized use of trust land." (*Id.*, at p. 237; see e.g. §§ 6301 & 6900.)

The SLC's second erroneous theory in *Baykeeper I* was that sand mining is exempt from the requirements of the public trust doctrine because this activity does not permanently alienate a trust resource. (*Baykeeper I*, *supra*, 242 Cal.App.4th at p. 238.) This claim was factually erroneous because the SLC acknowledged during its CEQA review that sand mining does deplete a trust resource because " 'it extracts raw materials

6

from the earth at a rate greater than the natural processes that created the raw material.' " (*Id*. at p. 239.)  Furthermore, statutes and case law impose an affirmative duty on the SLC to take the public trust into account before authorizing private parties to extract minerals from public lands pursuant to 10-year mining leases.  (*Id.* at pp. 241–242.)

Finally, *Baykeeper I* rejected the SLC's contention that CEQA supplants the public trust doctrine.  (*Baykeeper I*, *supra*, 242 Cal.App.4th at p. 240.)  Compliance with an environmental statute may assist an agency in complying with its duties under the public trust doctrine.  (See *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 776; *Citizens for East Shore Parks*, *supra*, 202 Cal.App.4th at pp. 577–578.)  But CEQA review of a project does not necessarily or automatically satisfy the agency's affirmative duties to take the trust into account and protect public trust uses whenever feasible.  (*Baykeeper I*, *supra*, 242 Cal.App.4th at pp. 241–242.)

With this extensive guidance, *Baykeeper I* remanded this case to the superior court so that the SLC could comply with the public trust doctrine.

### C.  The SLC's Reconsideration of the Project

#### 1.  The Peremptory Writ

In April 2016, the superior court vacated the judgment and entered a new judgment in favor of Baykeeper on its cause of action alleging a violation of the public trust doctrine.  The following month, the court issued a peremptory writ of mandate ordering the SLC to set aside the 2012 lease approvals, and to "conduct a public trust analysis and reconsider the leases in light of the common law public trust doctrine" as required by *Baykeeper I*.  The court also ordered the SLC to file a return within 180 days, specifying "the actions taken to comply with terms of this Writ."

#### 2.  The SLC Staff Report

The SLC placed Hanson's project on a "Consent Calendar" for its June 28, 2016 public meeting.  SLC Staff prepared a report for this calendar item, which stated that the matter was being presented to the SLC to comply with *Baykeeper I* and the writ of mandate.  Noting that no particular form of administrative review was required, SLC Staff included a public trust analysis of the project in its report for the SLC to consider

7

before deciding whether to reapprove the sand mining leases. That analysis did not address substantive rulings in *Baykeeper I* or otherwise discuss case law applying the common law trust doctrine.

SLC Staff prefaced its public trust analysis with two general observations. First, SLC Staff stated that pursuant to statute and the common law trust doctrine, the state holds title to tidelands, submerged lands, and beds of navigable lakes "for the benefit of all people of the State for statewide Public Trust purposes that include, but are not limited to, waterborne commerce, navigation, fisheries, water-related recreation, habitat preservation, and open space." Second, SLC Staff observed that the impacts of the project on many public resources had been analyzed in the Final EIR, and therefore it incorporated the entire CEQA record into its public trust analysis.

The SLC Staff presented an argument that the SLC would not violate the public trust doctrine by reapproving the Hanson sand mining leases because: (1) sand mining constitutes waterborne commerce and navigation, which are public trust uses of the land; (2) even if sand mining is not itself a trust use, it does not conflict with trust uses such as fisheries, recreation, habitat preservation, and open space; and (3) sand mining furthers important state and public interests. To facilitate our review, we briefly address the main components of this thesis.

***SLC Staff's Theory that Sand Mining Is a Public Trust Use***. The first prong of the SLC Staff's theory was that "sand mining is a Public Trust use under waterborne commerce." SLC Staff reasoned as follows: Waterborne commerce is "the exchange or buying and selling of commodities on a large scale involving transportation [of water] from place to place." Hanson's sand mining operation constitutes waterborne commerce because the leases authorize the removal of alluvial sand from under the water, alluvial sand is a valuable commodity in the construction industry, and, "although sand mining is a private use of Public Trust lands, the State obtains rent and royalties for the State-owned resource that is mined more effectively by private entities." Moreover, the mined sand could potentially be used to meet societal and economic needs, including beach and habitat restoration, and public infrastructure projects.

The second prong of the SLC Staff's theory was that sand mining qualifies as a public trust use because sand miners engage in navigation. According to this argument, navigation is "the act of moving in a boat or ship over an area of water," and tugs and barges that are used to dredge mine "are engaged in the Public Trust purpose of navigation on the Bay." Moreover, SLC Staff opined that the project would not impede other navigation activities on the Bay because Hanson would be subject to the same regulatory requirements as other vessels and Hanson's tugboat captains had never reported experiencing navigational conflicts in the past. Therefore, SLC Staff advised that "the sand mining vessels are themselves engaged in the Public Trust purpose of navigation on the Bay, and neither the mining itself nor transport by tug and barge substantially impair the public rights to navigation."

***SLC Staff's Analysis of Other Public Trust Uses***. As part of its discussion of waterborne commerce and navigation, the SLC Staff concluded that granting Hanson's leases would not impair the public right to use the lease parcels for waterborne commerce and navigation. SLC Staff also characterized fishing, water-related recreation, "public access," and "open space" as purposes or rights protected by the public trust doctrine. SLC Staff opined that approving the Hanson project would not substantially impair these rights, relying on evidence that the mining leases were restricted in terms of location and duration, that Hanson would be subject to extensive regulations and supervision, and that Hanson's prior sand mining activities had not caused any substantial impairment. The Staff analysis also separately addressed two public trust issues unique to sand mining.

First, the SLC Staff determined that reapproving the sand mining leases would not impair mineral resource availability within the lease areas. The SLC Staff report summarized scientific evidence and data supportive of the conclusion that "continued sand mining for the remainder of the proposed lease term, even at the increased Project volumes, would not result in substantial depletion of the sand resource."

Second, the SLC Staff addressed whether the Hanson project would impair the public trust by having an adverse effect on sediment transport and coastal morphology. As part of this analysis, SLC Staff assessed whether and to what degree sand mining

9

causes erosion by altering sediment transport patterns to the San Francisco Offshore Bar and Ocean Beach.[5] SLC Staff incorporated the Final EIR's extensive analysis of this issue, which included project specific modeling and summaries of scientific evidence that had been prepared by Coast Harbor Engineering (CHE), and which concluded that the sand mining project would not have a significant project-specific or cumulative adverse environmental impact on sediment transport and coastal morphology. SLC Staff also considered a supplemental study of Hanson's project that CHE completed in 2013 on behalf of another agency that conducted a review of this project. The 2013 CHE report, which compiled and synthesized additional scientific data, concluded that the evolution of the Bar and related coastal erosion are controlled by many larger-scale long-term processes other than sand mining, and that "[t]he incremental contribution of sand mining is so small as to be immeasurable in terms of elevation changes at the Bar."

Ultimately, SLC Staff concluded that the CHE reports and various scientific studies supported the conclusion that "there would be no or negligible impacts to Public Trust uses and values for the Bar or at Ocean Beach such as beach replenishment, recreational use, or public access."

***The Public and State Interests***. SLC Staff reported that sand mining is in the public interest and the state's best interest for the following reason: "Although sand mining is a private commercial use of Public Trust lands, it is accomplished with strong oversight by the State on a revenue sharing basis (rent and royalties) and sand mining results in many public benefits." The SLC Staff's examples of such benefits included: extracting minerals to meet the needs of society and ensure the financial well-being of the State; providing alluvial sand to the construction industry; using sand for public projects in the Bay Area; and reducing the environmental impacts associated with importing sand into the state from land-based sources.

---

[5] "The San Francisco Offshore Bar (Bar) 'is an area directly west of the Golden Gate Bridge where sand and sediments flow through at high velocities from the narrow gate into a wide and shallow horse-shoe shaped plateau where sediments are deposited.' " (*Baykeeper I*, *supra*, 242 Cal.App.4th at p. 213, fn. 2.)

10

***Recommended Findings and Actions***.  At the end of its report, the SLC Staff recommended the SLC make the following findings:

"1.  Find that sand mining as described under the facts and circumstances above . . . is a Public Trust use under the purposes of waterborne commerce and navigation.

"2.  Find that in the alternative, even if sand mining is not a Public Trust use, approval of the Leases is consistent with the common law Public Trust Doctrine based upon the particular facts at the lease area locations including the relatively small amount of material proposed to be mined compared with the total resource available, and the limited geographic area of the Leases compared with other sandy bottom habitat and the entire Bay, and that sand mining under the Leases will not interfere with the trusts upon which such lands are held or substantially impair the public rights to navigation, fisheries, water-related recreation, public access, habitat, open space or other Public Trust needs and values at this time and for the limited 10-year lease term beginning January 1, 2013.

"3.  Find that the issuance of the Leases is in the public interest and the best interests of the State at this time."

SLC Staff also requested that the SLC authorize the following actions:  "1.  Set aside the October 19, 2012 lease approvals for four General Leases-Mineral Extraction, Lease Nos. PRC 709.1, PRC 2036.1, PRC 7779.1, and PRC 7780.1 in Central San Francisco Bay (Calendar Item No. 101).  [¶] 2.  Approve the reissuance of Leases identified as the Reduced Project Alternative with increased volume option for the lands described in Exhibit B attached and by this reference made a part hereof, and the terms and conditions summarized below and more particularly set forth in the Leases on file with the Commission."

### 3.  SLC's Findings and Reapproval of the Hanson Project

At its June 2016 public meeting, the SLC began its consideration of Hanson's project with an SLC Staff presentation, which included a summary of its public trust analysis.  Baykeeper objected to the SLC Staff report and opposed its recommendations, arguing that the SLC Staff adopted an erroneous definition of a public trust use and made faulty legal arguments.  The SLC also heard from representatives of Hanson, who

11

described the company's work and supported the SLC Staff's public trust analysis and recommendations. Following these presentations, SLC Commissioner and Lieutenant Governor Gavin Newsom expressed appreciation for Baykeeper and its work and opined that its concerns had "strengthened" the leases, but he also stated that the SLC Staff made a compelling counterweight argument for moving forward with the project. Thereafter, the three members of the SLC voted unanimously to adopt the SLC Staff recommendations.

### D. The Order Discharging the Peremptory Writ

On November 10, 2016, the SLC filed a "Return to Peremptory Writ of Mandate," which stated that the SLC complied with the writ by (1) having the SLC Staff conduct a thorough public trust analysis and recommend findings, and (2) considering the SLC Staff's public trust analysis at the June 2016 public meeting before voting unanimously to approve Calendar Item No. C33 and set aside the October 2012 lease approvals and approve reissuance of the leases. By separate motion, filed jointly with Hanson, the SLC requested an order discharging the peremptory writ.

Baykeeper opposed the motion to discharge the writ, arguing that (1) the SLC erred as a matter of law by defining sand mining as a public trust use; and (2) the SLC's finding that sand mining would not impair the trust was not supported by substantial evidence because there is overwhelming scientific evidence that sand mining causes erosion, which indisputably impairs trust resources.

On April 21, 2017, the trial court filed an order granting the motion to discharge the peremptory writ (the April 2017 order). The court found that the SLC had "fulfilled the procedural requirements of the peremptory writ," and that all its "Public Trust Findings" were supported by the record.

### III. DISCUSSION

### A. Issues Presented and Standards of Review

Baykeeper contends the SLC violated the public trust doctrine by reapproving the Hanson leases pursuant to findings that (1) sand mining is a public trust use of sovereign lands and (2) Hanson's project will not impair the public trust. We independently review

12

the record, applying the same standards of review as the trial court. (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection* (2008) 44 Cal.4th 459, 479.)

Generally, an agency's regulatory approval is reviewed for abuse of discretion, which is established if the agency failed to comply with required procedures or made findings that are not supported by substantial evidence. (*Environmental Protection Information Center v. California Dept. of Forestry & Fire Protection*, *supra*, 44 Cal.4th at p. 478.) However, to the extent the SLC purported to interpret the common law public trust doctrine, its legal conclusions are reviewed de novo. (*Citizens for East Shore Parks*, *supra*, 202 Cal.App.4th at p. 573.)

The SLC and Hanson (collectively, respondents) contend that the SLC's public trust findings must be affirmed unless they are arbitrary and capricious because they are "quasi-legislative determination." (Citing *County of Orange v. Heim* (1973) 30 Cal.App.3d 694, 718–719.) According to respondents, the SLC acts in a quasi-legislative capacity whenever it administers the state's sovereign lands because the legislature has delegated "exclusive jurisdiction over California's tide and submerged lands to the SLC." (Citing § 6301.) We disagree with this reasoning.

"As a general matter, an 'administrative action is quasi-legislative' when the 'administrative agency is creating a new rule for future application . . . .' [Citations.] [¶] By contrast, an 'administrative action is … quasi-adjudicative' when the 'administrative agency . . . is applying an existing rule to existing facts.' [Citations.]" (*20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 275.) Here, the SLC's acts were quasi-adjudicatory because it did not purport to create a new rule of law under the public trust doctrine, nor did it have the statutory authorization to do so. Section 6301 states that the SLC "may lease or otherwise dispose of [trust] lands, as provided by law . . . ." (§ 6301.) As noted in *Baykeeper I*, "[t]he SLC's trust obligations are also reflected in statutory provisions regulating the leasing of public lands. (See, e.g., §§ 6895 ['whenever the lands for which a lease is sought are tide and submerged lands, the [SLC] may divide the lands into the size and number of parcels as the [SLC] determines will not substantially

13

impair the public rights to navigation and fishing or interfere with the trust upon which the lands are held'], 6900 [authorizing mineral extraction leases from tide and submerged lands that are in the public interest which 'will not interfere with the trust upon which such lands are held or substantially impair the public rights to navigation and fishing'].)" (*Baykeeper I*, *supra*, 242 Cal.App.4th at pp. 239–240.) Thus, the SLC is not "exempt from the law, but must comply with the requirements of the common law trust doctrine when administering trust lands. [Citation.]" (*Id.* at p. 239.)

### B. Sand Mining Is Not a Public Trust Use

The first issue raised in this appeal pertains to the propriety of the SLC's finding that the Hanson sand mining leases qualify as a public trust use of the submerged lands under the Bay. Baykeeper joined by a group of law professors who filed an amicus brief in this case contend that the SLC committed an error of law by making this finding. They argue that the SLC's overbroad definition of a public trust use is inconsistent with *Baykeeper I* and other cases construing the public trust doctrine.

Respondents' initial preference is for this court to ignore the question whether the Hanson leases constitute a public trust use and affirm the SLC's decision to reapprove the project on the alternative ground that granting the leases will not impair the public trust. However, respondents also defend the SLC's primary finding. Arguing that the question whether an activity constitutes a public trust use is factual rather than legal, respondents contend that the public trust analysis in the SLC Staff report amply supports the finding that sand mining "is a Public Trust use under the purposes of waterborne commerce and navigation."

The issue of what constitutes a public trust use is integral to a proper application of the common law doctrine. When a proposed action constitutes a public trust use, the state trustee has broad discretion to permit that use and even to promote it over other legitimate trust uses. (*National Audubon*, *supra*, 33 Cal.3d at p. 439, fn.21 & p. 440; see also *Colberg, Inc. v. State of California ex rel. Dept. Pub. Wks* (1967) 67 Cal.2d 408, 419 (*Colberg*).) However, the State may not employ an overbroad conception of a public trust use that would undermine the primary function of the common law doctrine, which

14

is to protect the right of the public to access and enjoy public trust lands. (*National Audubon*, at pp. 440–441.) Furthermore, as discussed above, *Baykeeper I* explicitly rejected the SLC's position that private sand mining leases qualify as a public trust use of submerged lands under the Bay. *Baykeeper I* is the law of this case and applied controlling precedent that the SLC is not free to ignore.

Thus, contrary to respondents' position in this appeal, the SLC's decision to reapprove the Hanson project pursuant to a finding that the sand mining leases constitute a public trust use is neither superfluous nor academic. Furthermore, we cannot allow the superior court's affirmance of this finding to stand because it conflicts with the law.

According to the SLC Staff report, the sand mining leases constitute a public trust use because Hanson uses boats to extract alluvial sand and then transports this valuable resource into the stream of commerce. This conception of a trust use is not supported by any authority that has been brought to our attention. Furthermore, the defining principles of the public trust doctrine establish that, by its very nature, a public trust use is a use that facilitates public access and enjoyment of trust property for such purposes as navigation, commerce, and recreation. (*Baykeeper I*, *supra*, 242 Cal.App.4th 232–233 [and cases discussed].) The Hanson leases, which authorize private commercial sand mining, are not a public trust use of the submerged lands at issue in this case.

If we were to approve the definition of a public trust use as set forth in the SLC Staff report, any private commercial use of trust property that involves a boat could be deemed a trust use and could be authorized automatically pursuant to the SLC's authority to prefer one trust use over another. This conception of a public trust use is impermissibly overbroad because it would give the state trustee free authority to allocate trust property without regard to its obligation to preserve trust resources for public use and enjoyment. (See *National Audubon*, *supra*, 33 Cal.3d at p. 440.) In *National Audubon*, the Attorney General tested the boundaries of the rule that the public trust doctrine does not prevent the state from choosing between trust uses by adopting a broad definition of a trust use as encompassing any public use of trust property. The Supreme Court rejected this view, which would have the practical effect of imposing "no

15

restrictions on the state's ability to allocate trust property," and which was not supported by public trust law. (*Id*. at p. 440.) In the present case, respondents' conception of a trust use is even broader than the definition disapproved in *National Audubon*.

Indeed, by adopting the public trust analysis in the SLC Staff report, the SLC continued to employ the same erroneous theory that it used in *Baykeeper I* to attempt to avoid having to consider the public trust doctrine at all. *Baykeeper I*'s rejection of that theory was unequivocal, as reflected in the following passage: "[T]he SLC makes the factual argument that Hanson's mining operation fits within the traditional trust uses of navigation and commerce because a tugboat and barge are used to reach the mining site, to dredge the sand, and to transport it for commercial purposes. The SLC maintains that a 'more water-dependent and navigational use could hardly be imagined.' But this factual argument highlights the flawed definition of a public trust use which runs throughout the SLC's arguments in this appeal. The trust doctrine protects and promotes public uses, including commerce and navigation. It cannot justify the private use of public property on the basis that the private party engaged in a water dependent activity for its own private commercial purpose. Rather, such a private use is permissible only if it is consistent with the protections afforded by the public trust doctrine." (*Baykeeper I*, *supra*, 242 Cal.App.4th at p. 238, italics omitted.)

In this appeal, respondents do not attempt to reconcile the SLC's finding with *Baykeeper I*. Instead, they posit that a public trust use is a broad and flexible concept, easily embracing private uses that are consistent with public trust purposes. This argument misapplies a defining principle of the public trust doctrine. "The courts have construed the purpose of the trust with liberality to the end of benefitting all the people of the state." (*Colberg*, *supra*, 67 Cal.2d at p. 417.) In other words, the concept of a public trust use is " 'sufficiently flexible to encompass changing *public needs*,' " such as the preservation of trust lands in their natural state so that they can be used and enjoyed by future generations. (*National Audubon*, *supra*, 33Cal.3d at p. 434, italics added.) Stretching this concept to include a private commercial operation that does not facilitate public access to or enjoyment of trust lands would destroy the principle itself.

16

Furthermore, respondents erroneously conflate two distinct concepts by equating a public trust use with any use that is "consistent" with the public trust. As amici curiae law professors contend, "[t]here is an important difference between a trust use, which an agency may balance against other trust uses, and a non-trust use, which an agency may authorize so long as it does not impair trust uses." In respondents' view, this distinction has no practical function because, either way, the SLC has authority to grant the leases. But a public trust use is categorically legitimate, while a public non-trust use or a private commercial use can be authorized only if it does not impair the trust. (*Baykeeper I*, *supra*, 242 Cal.App.4th at pp. 232–243.) This distinction is a vital check on the state trustee's power to administer lands that it holds for the benefit of the public. (*National Audubon*, *supra*, 33 Cal.3d at p. 440.)

Taking a different tack, respondents argue that the specific sand mining leases at issue in this case constitute a public rather than private "use" of trust property. They reason that alluvial sand is not actually *used* by Hanson, but rather by members of the public who need it for their various projects, and that the state also participates in this "endeavor" by deriving revenue from the leases. Again, this reasoning is flawed. The SLC did not approve a project authorizing Hanson to distribute alluvial sand to the public on behalf of the state. It approved leases that authorize a private party to extract and remove a trust asset so that it can make whatever profit from that product the market will bear. Thus, the relevant inquiry is whether *Hanson's use* of public land is a trust use. This use may be lawful, but it is not a public trust use of the land under the Bay.

**C. The Record Supports the Finding the Trust Will Not Be Impaired**

As we have discussed, although commercial sand mining is not categorically permissible as a public trust use, the SLC may authorize private uses of trust property that do not impair the trust. (*Baykeeper I*, *supra*, 242 Cal.App.4th at pp. 235-238.) Consistent with this common law rule, section 6900 codifies the SLC's authority to grant leases for the extraction of minerals other than oil and gas from trust lands "when it appears to be in the public interest" and when "it appears that the execution of such leases

17

and the operations thereunder will not interfere with the trusts upon which such lands are held or substantially impair the public rights to navigation or fishing." (§ 6900.)

Here, the SLC's alternative ground for approving the Hanson project is based on findings that the project will further the interests of the public and the state without impairing public trust uses or values. In this appeal, Baykeeper challenges one discrete aspect of the SLC's analysis in support of these findings. According to Baykeeper, the record compels the conclusion that Hanson's project will impair the trust by causing erosion at Ocean Beach and the San Francisco Bar, both of which are public trust resources.

As discussed above, as part of its public trust analysis, the SLC Staff report concluded that Hanson's sand mining activities would not impair public trust uses by either substantially depleting the sand resource or substantially interfering with sand transport and coastal morphology at the San Francisco Bar and Ocean Beach. These conclusions are supported by substantial evidence, which includes a trilogy of CHE studies that were discussed in the SLC Staff report. The CHE reports were also discussed at more length in *Baykeeper I*, as they were the core evidence supporting findings under CEQA that this project will not have a significant adverse impact on sediment transport and coastal morphology. (*Baykeeper I*, *supra*, 242 Cal.App.4th at pp. 219–225.)

Baykeeper contends that the SLC erred by relying on its CEQA findings regarding the effects of the project on sediment transport and coastal morphology. According to this argument, *Baykeeper I* "deferred" to the SLC's finding that the sand mining leases would not have a significant impact on erosion at the Bar and Ocean Beach "for purposes of CEQA," but the court also "specifically stated that this analysis did not meet the [SLC's] obligations under the public trust." This argument misconstrues *Baykeeper I*. At that juncture in this case, the record showed that the SLC had made a decision about the management and use of trust property without *any* consideration of the public trust doctrine, "whether in the context of CEQA review or otherwise." (*Baykeeper I, supra*, 242 Cal.App.4th at p. 242.) Thus, in rejecting the SLC's contention that a satisfactory CEQA review necessarily satisfies the requirements of the public trust doctrine,

18

*Baykeeper I* explained that cases finding that the state had conducted an adequate public trust analysis as part of its CEQA review were distinguished on their facts. Furthermore, and crucially, *Baykeeper I* did not hold or intimate that the SLC's CEQA analysis of the project impacts on coastal morphology was inadequate or incomplete. Nothing in that decision precluded the SLC from incorporating its CEQA data into its subsequent public trust analysis of the project.

Finally, Baykeeper contends that the SLC violated its continuing duties to protect public trust assets by re-approving the Hanson project in 2016, even though new scientific research conducted after the SLC completed its CEQA review "establish[es] a definitive causal link between sand mining and coastal erosion." Baykeeper acknowledges that this evidence is part of the administrative record and it does not contend that the SLC ignored it. Instead, Baykeeper contends that CHE and the SLC either misunderstood or misrepresented the scientific evidence by concluding that sand mining is not a significant cause of erosion. This same argument was rejected in *Baykeeper I* because it is outside the scope of our standard of review. (See *Baykeeper I*, *supra*, 24 Cal.App.4th at pp. 224–225.) The record shows that Baykeeper and the SLC continue to take different sides in the scientific controversy regarding the impacts of sand mining on coastal morphology, but this disagreement is not a ground for overturning a finding by the SLC that is supported by substantial evidence.

## IV. DISPOSITION

To summarize our conclusions, we resolve the issues in this appeal by applying the public trust principles outlined in *Baykeeper I*, *supra*, 242 Cal.App.4th at pages 234 to 243. The record now shows that the SLC performed its duty to take the public trust into account before it reapproved the Hanson sand mining project. It erred by finding that the Hanson mining leases constitute a public trust use of the sovereign land under the Bay because a private commercial use of trust property that does not facilitate public access to or public enjoyment of trust lands is not a public trust use of those lands. Nevertheless, substantial evidence supports the SLC's findings that the project will not impair public

19

trust uses or values.  Accordingly, the April 2017 order discharging the preemptory writ of mandate is affirmed.  The parties are to bear the own costs on appeal.

_____

LEE, J.*

We concur:

_____

STREETER, Acting P. J.


_____

REARDON, J. **

* Judge of the Superior Court of California, County of San Mateo, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

** Retired Associate Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A151821, *San Francisco Baykeepers, Inc. v. State Lands Commission*

Filed 11/27/18

# CALIFORNIA COURT OF APPEAL
# FIRST APPELLATE DISTRICT
# DIVISION FOUR

SAN FRANCISCO BAYKEEPER, INC.,
   Plaintiff and Appellant,
   v.
STATE LANDS COMMISSION,
   Defendant and Respondent;
HANSON MARINE OPERATIONS, INC., et al.,
   Real Parties in Interest.

A151821
San Francisco County
Sup. Ct. No. CPF12512620

BY THE COURT:

The two requests filed on November 20, 2018 that this court's October 31, 2018 opinion be certified for publication is granted. The Reporter of Decisions is directed to publish said opinion in the Official Reports.

Date: November 27, 2018                                    Streeter, Acting P. J.

Trial Court:   San Francisco City & County Superior Court

Trial Judge:   Hon. Teri L. Jackson

Counsel:

Erica Maharg, M. Benjamin Eichenberg, Nicole C. Sasaki for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Daniel A. Olivas, Senior Assistant Attorney General, David Alderson, Supervising Deputy Attorney General and Joel Jacobs, Deputy Attorney General for Respondent.

Downey Brand LLP, Christian L. Marsh, Arielle O. Harris for Real Party in Interest.

A151821/*San Francisco Baykeeper v. CA State Lands Commission*