Filed 5/17/23  Herron v. Feast and Fareway CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| DENISE M. HERRON,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>FEAST AND FAREWAY, LLC,<br><br>    Defendant and Respondent. | D079915<br><br><br>(Super. Ct. No. 37-2020-00036537-CU-OR-CTL) |


APPEAL from a judgment of the Superior Court of San Diego County, Carolyn M. Caietti, Judge.  Affirmed.

Stephen M. Hogan for Plaintiff and Appellant.

Delmore Greene and Elizabeth A. Donavan for Defendant and Respondent.

Denise Herron was ejected from a restaurant located at the Coronado Municipal Golf Course.  In response, she brought this action seeking a declaration that the concession contract between the City of Coronado (City) and the restaurant owner, Feast and Fareway, Inc. (Feast), is illegal and void under the public trust doctrine, as codified in Public Resources Code section 6009.1.  As amended, Herron's operative complaint also asserts that Feast

violated the anti-retaliation provision of the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940, subd. (h)) by ejecting her from the restaurant in retaliation for reporting that she witnessed one Feast employee inappropriately touching another. She appeals from the trial court's dismissal of these two claims against Feast after an order sustaining its demurrer.

On de novo review, we conclude that Herron's declaratory relief claim fails to state facts sufficient to allege a breach of the public trust doctrine. As to the FEHA retaliation claim, we conclude that even though the statute covers retaliation against a non-employee, the trial court correctly ruled that Herron failed to allege she had suffered an adverse employment action, as required under *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1049–1055 (*Yanowitz*). Accordingly, we affirm the judgment of dismissal.

## FACTUAL AND PROCEDURAL BACKGROUND

Feast has a contract with the City to serve as a concessionaire providing food and beverage services at the Coronado Municipal Golf Course. Feast operates a restaurant in the golf course building, where it also hosts private events and banquets.

Feast's concession contract with the City states in relevant part: "The City operates and maintains a public golf course open and available for use by the general public . . . . Essential to the operations of the Golf Course, the City has required and continues to require the services of a concessionaire to operate the food and beverage amenities and concession serving the public at the Golf Course. . . . The food and beverage services contemplated by this Agreement are essential and complimentary to the operations of a public municipal golf course and consistent with existing use of the Golf Course."

2

Herron is a resident of Coronado, California. On January 8, 2020, Feast barred her from the premises of the restaurant, including outdoor patio areas not subject to its control.

In response, Herron filed a complaint and then a first amended complaint against Feast and the City. She alleged claims for (1) declaratory relief; (2) breach of the concession contract between the City and Feast; and (3) violation of the Unruh Act (Civ. Code, § 51).

The declaratory relief claim set forth the history of the golf course and alleged that the property was subject to the "Public Trust Doctrine" codified in section 6009.1 of the Public Resources Code. Specifically, in 1923, the State Lands Commission conveyed what was then submerged property under Glorietta Bay to the City to be held and used in trust. After dredging the bay, the City filled in the tidelands and constructed the golf course, which opened in 1957. In 1962, the Legislature passed the San Diego Unified Port District Act, which resulted in a conveyance of the property to the San Diego Unified Port District (Port District). The Port District then leased the property back to the City to be operated in trust for the benefit of the public. The lease allows the property to be used as "a public golf course open and available for use by the general public including driving range, pro shop, golf cart rental, and snack bar including the sale of alcoholic beverages and for no other purposes whatsoever." The lease also states: "This restriction on use of the leased premises absolutely prohibits a change in use. Lessee [the City] further agrees not to construct or operate any hotel, motel, restaurant, or cocktail lounge on the premises or in conjunction with said golf course."

Herron's declaratory relief claim alleged that the concession agreement between Feast and the City was void and illegal because it violated the City's lease with the Port District and the public trust doctrine by allowing Feast to

3

operate a restaurant as well as private events and banquets. Accordingly, Herron requested a declaration that the concession agreement was void.

Feast filed a demurrer to the first amended complaint. Feast asserted that the first cause of action for declaratory relief failed to state a claim because Herron lacked standing; the second cause of action for breach of contract failed to state a claim because Herron lacked standing to assert a breach of the concession agreement between the City and Feast and failed to allege any breach; and the third cause of action for violation of the Unruh Act failed to state a claim because Herron did not allege discrimination or discriminatory intent. In its papers, Feast did not address Herron's allegations regarding the public trust doctrine.

The trial court overruled Feast's demurrer to the first cause of action for declaratory relief, and sustained it without leave to amend the second cause of action, but with leave to amend the third cause of action. The court also granted Herron leave to amend to allege a fourth cause of action for sex discrimination and retaliation for reporting sexual harassment.

With regard to the declaratory relief claim, the court ruled: "A demurrer must dispose of an entire cause of action to be sustained. . . . Here, defendants did not address the allegations in the first cause of action regarding the Public Trust Doctrine, nor provide[] any legal authority concerning the Public Trust Doctrine. . . . Thus, the entire cause of action cannot be disposed of at this time."

Herron then filed the second amended complaint at issue in this appeal. She alleged the same declaratory relief claim without amendment; she did not re-allege the breach of contract claim; she amended the Unruh Act claim; and she alleged a new fourth claim for retaliation under the Fair Employment and Housing Act (FEHA) (Gov. Code, § 12940, subd. (j).) The

4

new FEHA claim alleged that Herron was ejected from Feast's premises in retaliation for reporting sexual harassment. Specifically, Herron alleged that she observed a male Feast employee sexually harassing a female employee by inappropriately touching her; she reported the sexual harassment to Feast's manager; and Feast permanently ejected her from the premises in retaliation for this report.

Feast filed another demurrer to the second amended complaint on the following grounds: (1) the first cause of action failed to state a claim for declaratory relief because Herron lacked standing and there had been no violation of the public trust doctrine; (2) the third cause of action failed to state an Unruh Act claim because Herron failed to allege specific facts supporting her claim of gender discrimination; and (3) the fourth cause of action failed to state a FEHA retaliation claim because no employment relationship or equivalent existed between her and Feast.

The court sustained the demurrer without leave to amend the first and fourth causes of action, but with leave to amend the third cause of action for violation of the Unruh Act. As to the first cause of action for declaratory relief, the court ruled: (1) to the extent Herron was seeking a declaration of rights under the concession agreement, she lacked standing because she was not a party or intended third-party beneficiary of the concession agreement; (2) to the extent Herron was seeking a declaration of rights under the public trust doctrine, the only proper defendants were the governmental entities alleged to have violated the public trust, not Feast as a private party; and (3) the second amended complaint did not state sufficient facts to allege an actual controversy or how Feast violated or breached the public trust doctrine, and plaintiff's opposition did not provide any legal authority supporting how Feast's conduct violated the public trust doctrine.

5

As to the fourth cause of action for FEHA retaliation, the court ruled that plaintiff had "not identified facts showing she had any employment relationship with [Feast] or suffered any adverse employment action."

Herron elected not to amend her third cause of action for violation of the Unruh Act. Accordingly, the court entered judgment in Feast's favor.

DISCUSSION

On appeal, Herron pursues only two of the theories of liability asserted below: (1) declaratory relief for the alleged violation of the public trust doctrine; and (2) FEHA retaliation. We begin with a procedural issue raised by Herron, then address each of these substantive claims applying a de novo standard of review. (*Bower v. AT&T Mobility, LLC* (2011) 196 Cal.App.4th 1545, 1552 [de novo standard of review for demurrer rulings].)

A.      *Successive Demurrers*

As she did below, Herron argues that the trial court lacked jurisdiction to decide Feast's second demurrer to the declaratory relief claim under Code of Civil Procedure section 430.41, subdivision (b), which states: "A party demurring to a pleading that has been amended after a demurrer to an earlier version of the pleading was sustained shall not demur to any portion of the amended complaint, cross-complaint, or answer on grounds that could have been raised by demurrer to the earlier version of the complaint, cross-complaint, or answer."

We agree with Herron that Feast asserted a new ground for the demurrer to the second amended complaint that could have been raised in its earlier demurrer to the first amended complaint. Specifically, Feast asserted that the first cause of action for declaratory relief failed to state a claim because "there has been no violation of the Public Trust Doctrine." Feast could have asserted this ground in its earlier demurrer to the first amended

6

complaint, because the allegations of this cause of action were identical in both versions of the complaint. Because Feast did not assert this ground in its demurrer to the first amended complaint, the trial court should not have sustained the demurrer to the second amended complaint on this ground. (Code Civ. Proc., § 430.41, subd. (b).)

However, we do not agree with Herron that this procedural error mandates reversal per se. The trial court did not lack jurisdiction in the fundamental sense because it had jurisdiction over the subject matter and the parties. At most, the court acted in excess of jurisdiction by sustaining the demurrer on this ground in violation of a procedural rule. (See *People v. American Contractors Indemnity Co.* (2004) 33 Cal.4th 653, 661 [" '[W]hen a statute authorizes [a] prescribed procedure, and the court acts contrary to the authority thus conferred, it has exceeded its jurisdiction.' "].) "Ordinarily, acts in excess of jurisdiction are subject to harmless error analysis, that is, they support a reversal of the judgment only upon a showing of prejudice." (*LAOSD Asbestos Cases* (2018) 28 Cal.App.5th 862, 871.)

The error here is not prejudicial because the trial court could have elected to treat this portion of Feast's demurrer as a motion for judgment on the pleadings, or Feast could have filed a separate motion for judgment on the pleadings, either of which would have resulted in the same outcome as the demurrer. (Code Civ. Proc., § 438.) A motion for judgment on the pleadings may be made on a ground not raised in an earlier demurrer. (*Id.*, subd. (g)(2).) "Like a demurrer, a motion for judgment on the pleadings attacks defects disclosed on the face of the pleadings or by matters that may be judicially noticed." (*Alameda County Waste Management Authority v. Waste Connections US, Inc.* (2021) 67 Cal.App.5th 1162, 1174.) " 'A motion for judgment on the pleadings is equivalent to a demurrer and is governed by

7

the same de novo standard of review.' " (*People ex rel. Harris v. Pac Anchor Transportation, Inc.* (2014) 59 Cal.4th 772, 777.) Accordingly, we conclude that this procedural error was not prejudicial.

B.   *Public Trust Doctrine*

Herron asserts that her first action for declaratory relief states a valid claim based on the public trust doctrine. As noted, the trial court sustained Feast's demurrer to this claim for several reasons, including that the second amended complaint "does not state sufficient facts of an actual controversy or how [Feast] violated or breached the public trust doctrine and [Herron]'s opposition does not provide any legal authority supporting how, under these facts, operation of [Feast]'s facility violates the public trust doctrine." We agree that Herron failed to allege facts sufficient to constitute a breach of the public trust. Accordingly, it is unnecessary for us to address the other grounds for the trial court's ruling on this claim.

The State of California holds title to the navigable waterways and the land beneath them within its borders as a trustee for the public. (*Colberg, Inc. v. State of California ex rel. Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 416.) Tidelands are included in the public trust. (*Graf v. San Diego Unified Port Dist.* (1992) 7 Cal.App.4th 1224, 1228 (*Graf*).) The public trust doctrine continues to apply to tidelands even if they are no longer submerged due to the placement of fill. (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 479.)

"Granted public trust lands remain subject to the supervision of the state and the state retains its duty to protect the public interest in granted public trust lands." (Pub. Resources Code, § 6009.1, subd. (a).) "The state acts both as the trustor and the representative of the beneficiaries, who are all of the people of this state, with regard to public trust lands, and a grantee

8

of public trust lands, including tidelands and submerged lands, acts as a trustee, with the granted tidelands and submerged lands as the corpus of the trust." (*Id*., subd. (b).)

The state may delegate its authority to manage and control public use of tidelands to a local agency. (*Graf*, *supra*, 7 Cal.App.4th at p. 1229.) Under the San Diego Unified Port District Act of 1962 (Harb. & Nav. Code, Appx. I), the State of California has delegated its authority to manage and control San Diego Bay to the Port District. The statutory scheme declares it to be the policy of the State to develop its harbors and ports "for multiple purpose use for the benefit of the people." (*Id*., § 2.) It gives the Port District the authority to lease any property within its jurisdiction (*id*., § 25) and to maintain or operate "facilities which are necessary or convenient for the promotion and accommodation of commerce, navigation, fisheries, and recreation, or their use in connection therewith . . . ." (*id*., § 57). It further states that the tidelands conveyed to the Port District "may be used for purposes in which there is a general statewide purpose" (*id*., § 87, subd. (a)), including "small boat harbors, marinas, aquatic playgrounds, and similar recreational facilities" and any facilities "necessary, or convenient for the promotion and accommodation of any of those uses, including, but not limited to, snack bars, cafes, restaurants, motels," etc. (*id*., § 87, subd. (a)(6)).

Herron does not contend that the use of the tidelands as a public golf course violates the public trust doctrine. Rather, her claim is that it violates the public trust doctrine to allow a private restaurant to operate on the golf course and hold private events there. As noted, however, the Legislature has specifically authorized facilities such as "snack bars, cafes, [and] restaurants" as necessary or convenient for the promotion and accommodation of recreational uses on tidelands within the Port District's jurisdiction.

9

(Harb. & Nav. Code, Appx. I, § 87, subd. (a)(6).)  The public trust doctrine does not prohibit the leasing of tidelands property to a private party to operate a restaurant incidental to a public recreational use.  (*Martin v. Smith* (1960) 184 Cal.App.2d 571, 573–574, 578 [lease of tidelands to private party to construct yacht harbor with restaurants and cocktail lounges was "consistent with the trust upon which said lands were conveyed to the city, and with the requirements of commerce and navigation of said harbor"].)

Nor does the doctrine prohibit such a restaurant from holding private events, so long as they do not interfere with the public trust uses.  A public agency "may authorize private uses of trust property that do not impair the trust." (*San Francisco Baykeeper v. State Lands Com.* (2018) 29 Cal.App.5th 562, 580 (*San Francisco Baykeeper*) [allowing commercial sand mining on public trust lands—even though it was not a public trust use—because it would not impair the trust]; see also *Zack's, Inc. v. City of Sausalito* (2008) 165 Cal.App.4th 1163, 1176 ["Trust lands may be devoted to purposes unrelated to the trust if such purposes are incidental to and accommodate trust uses . . . ."].)  Herron's complaint fails to allege how the operation of the restaurant or its private events interfere in any way with public trust uses.

Herron's sole argument on this point is that the operation of a restaurant on the golf course violates the public trust doctrine because the City's lease with the Port District states that the City may not "construct or operate any hotel, motel, restaurant, or cocktail lounge on the premises or in conjunction with said golf course."  But Herron cites no authority holding that a violation of such a lease provision is *ipso facto* a breach of the public trust.  As noted by Feast, a New York trial court rejected a similar claim in *Saska v. Metropolitan Museum of Art* (N.Y. Sup. Ct. 2016) 2016 WL 6682271 [unreported disposition].  There, the plaintiffs argued that a public museum's

10

admission fee violated the public trust doctrine because it was prohibited by the museum's lease with the City of New York. The court concluded that this argument was "an attempted end run" around the plaintiffs' lack of standing to assert a violation of the lease itself "by shoehorning those claims within the rubric of the public trust doctrine." (*Id.* at *8.)

Though not binding, we find this reasoning to be persuasive. Herron does not dispute that that she lacks standing to assert a violation of the lease between the Port District and the City because she is neither a party to the lease nor an intended third-party beneficiary. Without any supporting authority, she is attempting to recast this same claim as a breach of the public trust. But the duties imposed on the State and its grantees by the public trust doctrine are not defined by the lease agreement between the Port District and the City. Herron cannot circumvent her lack of standing to assert a violation of this lease agreement by dressing it up as a breach of the public trust. Accordingly, we agree with the trial court that Herron failed to allege a breach of the public trust.

Herron asserts that it is a factual question whether the defendants' conduct violates the public trust. We disagree. (*San Francisco Baykeeper*, *supra*, 29 Cal.App.5th at p. 577 [rejecting argument that "the question whether an activity constitutes a public trust use is factual rather than legal"].) Even if Herron were correct, however, that would not relieve her of the burden of stating sufficient facts to allege a breach of the public trust. She has failed to do so.

Herron also suggests that a demurrer cannot be used to adjudicate the merits of her declaratory relief claim because the existence of a justiciable dispute is all that is required to state such a claim. But " 'where the issue is purely one of law, if the reviewing court agree[s] with the trial court's

11

resolution of the issue it would be an idle act to reverse the judgment of dismissal for a trial on the merits.' " (*Hertzberg v. County of Plumas* (2005) 133 Cal.App.4th 1, 24.) " 'In such cases the merits of the legal controversy may be considered on an appeal from a judgment of dismissal following an order sustaining a demurrer without leave to amend and the opinion of the reviewing court will constitute a declaration of the legal rights and duties of the parties concerning the matter in controversy.' " (*Ibid.*) To avoid a pointless remand, we conclude as a matter of law that the facts Herron has alleged do not amount to a breach of the public trust.[1] This opinion therefore serves as the declaration of rights Herron sought in her declaratory relief claim.

C.     *FEHA Retaliation*

The trial court sustained Feast's demurrer to the FEHA retaliation claim solely because Herron had not alleged that (1) she had any employment relationship with Feast or (2) she had suffered any adverse employment action. We agree as to the second point, but not the first.

Government Code section 12940, subdivision (h) makes it unlawful "[f]or any employer, labor organization, employment agency, or person to discharge, expel, or otherwise discriminate *against any person* because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (Italics added.)

---

[1]     Herron has also failed to explain what additional facts she could allege to state a claim for breach of the public trust. (See *Jocer Enterprises, Inc. v. Price* (2010) 183 Cal.App.4th 559, 572 [plaintiff on appeal bears burden to show in what manner she can amend complaint and how it will change legal effect of pleading].)

By its terms, this statute prohibits the specified forms of retaliation or discrimination against "any person." The ordinary meaning of the word "any" is "without limit and no matter what kind." (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798.) "From the earliest days of statehood," the Supreme Court has "interpreted 'any' to be broad, general, and all embracing." (*California State Auto. Asso. Inter-Insurance Bureau v. Warwick* (1976) 17 Cal.3d 190, 195, citing *Davidson v. Dallas* (1857) 8 Cal. 227, 239 [construing "any" to mean "every"].) Moreover, Government Code section 12925, subdivision (d) broadly defines a "person" as follows: " 'Person' includes one or more individuals, partnerships, associations, corporations, limited liability companies, legal representatives, trustees, trustees in bankruptcy, and receivers or other fiduciaries." Thus, the plain language of the statute is not limited to retaliation against employees. Rather, it more broadly prohibits retaliation against *any individual* (or the specified non-employee entities) for opposing a FEHA violation, filing a FEHA complaint, or testifying or assisting in any FEHA proceeding.

We are bound by the plain language and definitions used by the Legislature when it enacted the FEHA. (See *MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1087.) By forbidding retaliation against "any person" (Gov. Code, § 12940, subd. (h)), and defining "person" to include "individuals" and non-employee entities (Gov. Code, § 12925, subd. (d)), the Legislature made clear that the FEHA anti-retaliation provision is not limited to retaliation against employees. The Legislature certainly knew how to limit FEHA's protections to employees or applicants, as it did explicitly in other subdivisions of the same section. (See, e.g., Gov. Code, § 12940, subds. (d), (f)(1), (m)(1), (p).) But it used the broader "any person" language in the anti-retaliation provision. (*Id.*, subd. (h).)

13

"When the Legislature uses materially different language in statutory provisions addressing the same subject or related subjects, the normal inference is that the Legislature intended a different meaning." (*People v. Trevino* (2001) 26 Cal.4th 237, 242.)

This result is further supported by *Fitzsimons v. California Emergency Physicians Medical Group* (2012) 205 Cal.App.4th 1423 (*Fitzsimons*). The plaintiff there was a partner in a medical partnership (CEP). She sued CEP alleging that it retaliated against her for reports she made to her supervisors about sexual harassment of female employees. At trial, a jury found that the plaintiff was a partner of CEP, but not an employee. Based on this finding, the trial court concluded that she lacked standing to assert a FEHA retaliation claim. (*Id.* at pp. 1425–1426.)

The Court of Appeal reversed and concluded that "the FEHA does support a claim for retaliation by a partner against her partnership for opposing sexual harassment of an employee." (*Fitzsimons*, *supra*, 205 Cal.App.4th at p. 1425.) The court reasoned: "While CEP is not in an employment relationship with plaintiff, CEP is the employer of those persons who are the victims of the alleged harassment that plaintiff reported, for which she allegedly became the subject of CEP's retaliation. The harassment of CEP employees, if proven, is an unlawful practice for which CEP is liable under [Government Code] section 12940, subdivision (j). And subdivision (h) makes it an unlawful practice for CEP to retaliate against 'any person' for opposing that harassment. Interpreting 'person' in the context of those against whom the employer may not retaliate to include a partner gives the word its normal meaning and is consistent with the definition in section 12925, subdivision (d)." (*Fitzsimons*, at p. 1429.)

14

The same reasoning applies here. Interpreting the word "person" to include a customer or patron gives the word its normal meaning and is consistent with the definition in Government Code section 12925, subdivision (d). Although Herron herself was not an employee of Feast, Feast employed the person who was the alleged victim of the sexual harassment reported by Herron. To encourage compliance with FEHA, the Legislature evidently decided to prohibit an employer from retaliating against *any* individual for opposing a FEHA violation, including customers, patrons, vendors, independent contractors, or others. This promotes the purpose of the statute by encouraging anyone with knowledge of a FEHA violation to oppose it with the protection of a legal prohibition against retaliation. We must apply the statute as written to carry out the Legislature's intent as expressed in its plain language.

We nevertheless conclude that Herron's complaint fails to state a FEHA retaliation claim because she has not alleged that she suffered an adverse employment action. (*Yanowitz, supra*, 36 Cal.4th at pp. 1049–1055.) The statute makes it unlawful to "discharge, expel, or otherwise discriminate against" the person opposing the FEHA violation. (Gov. Code, § 12940, subd. (h).) In *Yanowitz*, the Supreme Court ruled that "the term 'otherwise discriminate' in [Government Code] section 12940(h) should be interpreted to refer to and encompass the same forms of adverse employment activity that is actionable under section 12940(a) [the substantive anti-discrimination provision]." (*Yanowitz*, at pp. 1050–1051.) Accordingly, the anti-retaliation provision requires "an adverse employment action" that "must materially

affect the terms, conditions, or privileges of employment to be actionable . . . ." (*Id*. at p. 1137.)[2]

Although *Yanowitz* involved alleged retaliation against an employee, we see no basis to conclude that the statute offers broader protection to non-employees. The operative language of the statute is the same for employees and non-employees alike. Under *Yanowitz*, employees cannot sue for retaliatory acts that do not affect the terms, conditions, or privileges of their employment. The identical statutory language logically requires the same result for non-employees. Moreover, it is possible for an employer to retaliate against a non-employee in a manner resulting in an adverse employment action. For example, an employer could cause a non-employee to be fired from a job with another employer, which would constitute an adverse employment action within the meaning of *Yanowitz*. (See *Yanowitz, supra*, 36 Cal.4th at p. 1054 [defining adverse employment action to include "the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career"]; see also *Robinson v. Shell Oil Co.* (1997) 519 U.S. 337 [holding that employer's postemployment retaliation against former employee by giving a negative job reference to another

---

[2]     Under federal law, by contrast, Title VII's anti-retaliation provision "does not confine the actions and harms it forbids to those that are related to employment or occur at the workplace." (*Burlington Northern & Santa Fe Ry. Co. v. White* (2006) 548 U.S. 53, 57.) The United States Supreme Court has construed Title VII more broadly to forbid any retaliatory action that would dissuade a reasonable person from making or supporting a charge of discrimination. (*Ibid*.) But in *Yanowitz* (decided ten months before *Burlington Northern*), our Supreme Court specifically rejected this deterrence standard in construing the FEHA anti-retaliation provision. (*Yanowitz, supra*, 36 Cal.4th at pp. 1050–1051.) We are bound by *Yanowitz*. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

prospective employer was actionable under Title VII].) We therefore conclude that an adverse employment action is required, rather than some other form of retaliation not affecting the terms, conditions, or privileges of employment. (See also *Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 885 [citing *Yanowitz* for the proposition that "[t]o prove unlawful retaliation, [plaintiff] must . . . show [defendant] subjected him to adverse employment actions for impermissible reasons . . . ."].)

Herron argues that her mere expulsion from the restaurant was sufficient because the statute says that an employer may not "discharge, *expel*, or otherwise discriminate against" anyone for opposing a FEHA violation. (Gov. Code, § 12940, subd. (h), italics added.) But the word "expel" cannot be read in isolation; we must construe the words of the statute in context and harmonize related provisions to the extent possible. (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) It would make little sense for the catch-all phrase "or *otherwise* discriminate against" to require an adverse employment action under *Yanowitz, supra*, 36 Cal.4th at pages 1049–1055, but not the other more specific forms of discrimination or retaliation listed immediately preceding that phrase. We must construe the statute to avoid such an incongruity and reconcile its related provisions. We therefore conclude that the trial court properly sustained the demurrer to Herron's FEHA claim because she has not alleged an adverse employment action.[3]

---

[3] We can imagine a scenario in which Feast's expulsion of a non-employee from the restaurant could result in an adverse employment action. For example, if Feast permanently expelled someone who was regularly employed by a caterer for events at that location, and the expulsion caused her to lose her job with the catering company, it could constitute an adverse employment action.

## DISPOSITION

The judgment of dismissal is affirmed. Respondent shall recover its costs on appeal.

BUCHANAN, J.

WE CONCUR:

DATO, Acting P. J.

KELETY, J.